**STATE of Maine**

v.

**Paul E. CRESS and Michael E. Shone.**

Supreme Judicial Court of Maine.

Aug. 29, 1975.

Donald H. Marden, County Atty., Augusta, Me., for plaintiff.

C. J. & N. C. Bourget, by Norman C. Bourget, Wathen & Wathen, by Warren E. Winslow, Jr., Augusta, Me., for defendants.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

DUFRESNE, Chief Justice.

Paul E. Cress and Michael E. Shone, in separate indictments, were charged with the crime of breaking and entering in the nighttime with intent to commit larceny under 17 M.R.S.A. § 754.[1] Following con-

---

1. 17 M.R.S.A. § 754. Breaking and entering with intent to commit felony or larceny

Whoever, with intent to commit a felony or any larceny, breaks and enters in the day-time or enters without breaking in the nighttime any dwelling house, or breaks and enters any office, bank, shop, store, warehouse, vessel, railroad car of any kind, motor vehicle, aircraft, house trailer, or building in which

solidation of the cases for trial, both defendants were found guilty by a Kennebec County jury. Sentenced respectively to the Maine State Prison, each appeals the judgment of conviction. We deny the appeals.

The evidence before the jury disclosed the following facts. On the evening of December 17, 1972, at approximately 11:00 p. m., one Romeo Maheu, while looking out the window of his home, observed a man who was carrying something under his arm walk out of the V.F.W. building on Redington Street, in Waterville.[2] This individual crossed Redington Street and proceeded toward the V.F.W. parking lot. Knowing the building to be closed, Mr. Maheu telephoned the manager of the V. F.W. canteen, one Norris Pilotte, and briefed him on his observations. Mr. Pilotte in turn notified the Waterville Police Department and then jumped into his automobile, arriving at the V.F.W. building some three to four minutes later. Upon arrival at the scene, Mr. Pilotte noticed a white station wagon in the V.F.W. parking lot and saw two men standing near the automobile, one on each side. Shortly thereafter, Officers Charles and Geel reached the area. Officer Charles noticed the two individuals and the station wagon in the parking lot. He recognized the defendants Cress and Shone, and so identified them at trial. He further testified that, when the police car appeared, Cress dropped a brown paper bag and entered the station wagon. He saw them leave with a third passenger in the automobile.

At this point in time Officer Geel followed the white station wagon, while Officer Charles accompanied Mr. Pilotte into the building, where both observed that the premises had been entered and ransacked. A safe had been moved from its usual location, a folding curtain at the bar had been pried open and several small containers used to collect donations had been cut open and their monetary contents were missing. Mr. Pilotte testified that the container used to collect donations for the muscular dystrophy fund was missing entirely.

Officer Charles then walked to the spot in the parking lot where the white station wagon had been parked. He picked up what appeared to be the paper bag which he saw one of the occupants of the car drop before leaving the area. At trial, Mr. Pilotte identified the contents of the paper bag as "a muscular dystrophy container," such as had been taken from the bar area of the V.F.W. building.

Officer Geel, meanwhile, succeeded in overtaking the white station wagon, the occupants of which he identified as the defendants Cress and Shone, with the third person being a Miss Malone. Following a call to police headquarters, Officer Geel arrested the defendant Shone on a matter unrelated to the V.F.W. break and asked Cress and Miss Malone to proceed to the Waterville Police Station.

Although Officer Geel, on his way to police headquarters, lost sight of the white station wagon, he came upon it again after it had been stopped by another Waterville police cruiser. At this time, the defendant Cress was arrested and removed from the automobile. His arrest was based upon information relayed by Officer Charles respecting the V.F.W. break. Miss Malone was instructed to drive the station wagon to police headquarters, which she did, escorted all the way by two police vehicles. The station wagon was parked and locked. Once inside the station house, Miss Malone and Shone were arrested for the break at the V.F.W., Cress having already been arrested at the time the car was stopped.

valuable things are kept, any person being lawfully therein and put in fear, shall be punished by imprisonment for not more than 10 years; but if no person was lawfully therein and put in fear, by imprisonment for not more than 5 years or by a fine of not more than $500.

2. This building is owned by the Forest J. Pare Post #1285, Veterans of Foreign Wars of the United States, Inc.

Retrieving the car keys from Miss Malone, Officers Charles and Geel, shortly after the reference arrests for breaking into the V.F.W. building, proceeded to the white station wagon parked in the police lot for the purpose of conducting what they termed a routine "inventory" of the car's contents. Upon entrance, Officer Geel saw, partially protruding from under the front seat, a blue dish with some coins in it. He further could see other coins scattered on the floor near that dish. The seized coins represented $14.00 in value.

Before the defendant Cress was placed in a cell following his arrest for the V.F.W. break, a search of his person disclosed the presence of $18.21 in coins in his pockets.

The defendant Cress challenges in this appeal the admissibility at trial of the State's three exhibits, 1) the brown paper bag containing the muscular dystrophy collection box (State's exhibit #1), 2) the coins in the amount of $18.21 seized in the course of the search of his person (State's exhibit #3) and 3) the coins found in the car in the amount of $14.00 (State's exhibit #2). The defendant Shone limits his claim of error to be the admission of State's exhibit #2. Both have argued that the evidence was insufficient to support their conviction.

1. *The admissibility of the brown paper bag containing the muscular dystrophy collection box*

■ Cress first contends that the contents of the paper bag were not identified at trial. In this, he is in error. Mr. Pilotte explained that the crushed cardboard in the paper bag was part of the only muscular dystrophy plastic container which was missing from the V.F.W. building. The defendant's objection to the effect that this exhibit had no probative value and was irrelevant, incompetent and immaterial is not well taken. The paper bag with its contents, dropped as it was by the defendant Cress near the scene of the crime, supplied a link in the chain of circumstances tying the defendants to the crime. The situation in the instant case is not unlike the factual pattern in *State v. Mimmovich*, 1971, Me., 284 A.2d 282.

In that case, articles of personal property, known to have been in a pool hall prior to its being burglarized, were found in close proximity to the spot which the defendants had selected as a hiding place and where the police apprehended them. On that occasion, this Court had this to say:

> "The jury might properly consider the presence of the hammer on the second floor and the breadpan on the third floor of the building on the roof of which the Defendants were hiding as valid links in the chain of circumstantial evidence which led them to the conclusion that Defendants' guilt had been proved. Their admission into evidence was not error."

■ That the manager of the canteen could not identify the coins, nor the muscular dystrophy container, as *the* particular items taken from the V.F.W. building for lack of personal marks or other identifying characteristics does not under the circumstances of the instant case render such evidence irrelevant. Ownership of personal property or possessory rights therein need not necessarily be established by direct proof, but may be proven by circumstances and inferences as well as by direct evidence. *State v. Small*, 1970, Me., 267 A.2d 912.

■ Cress further impugns the integrity of this exhibit on the basis that the chain of custody was not shown to be intact. It does appear from the record that, for a period of fifteen to twenty minutes during a luncheon recess at trial, the brown paper bag and its contents (exhibit #1), after having been marked for identification and identified as "a Muscular Dystrophy container that I was talking about" by Mr. Pilotte, were left unattended in a closed but unlocked desk drawer in the court

room. After the recess, the jury matron testified that she saw no one enter or leave the court room from her location in the room, conceding, however, that she did not have a complete view of all the entrances and that it was possible someone could have entered the room unobserved. The presiding Justice stated for the record that he had seen the exhibit placed in the drawer prior to the recess and saw it removed from the same drawer by a court officer when the trial resumed.[3] Cress further claims that several officers in the Waterville police department had access to the evidence locker in which the exhibit was stored.

In its consideration of such an issue of continuity of possession of exhibits proffered for admission in evidence, this Court made the following comments:

> "It suffices to say that by identifying markings and description the exhibits were adequately shown to be the same stolen in Turner and later found in the seat of the car in which the defendant rode." *State v. Mosher*, 1970, Me., 270 A.2d 451, 453.

> "There is no suggestion in the record of any careless handling of the exhibits by anyone or that the exhibits had been tampered with in any way." *State v. Lafferty*, 1973, Me., 309 A.2d 647, 657.

In *State v. Carvelle*, 1972, Me., 290 A.2d 190, the record was silent respecting the use of the exhibit (Cannabis) in the District Court at the preliminary hearing, but this Court ruled the objection to its admissibility meritless, stating "there was no evidence that the exhibit was not properly protected during the short interval that it was in the custody of the District Court, *a responsible agency of government*." (Emphasis supplied) In the instant case, even though the record shows that the exhibit was not given *absolute* and *complete* protection for the short period of 15 to 20 minutes, it does appear that the evidence was stored in a desk drawer *in the court room*, where an officer of the court was stationed and had a substantial overview of the area, making any tampering therewith very unlikely.

■ In order to protect the rights of the accused, such measures should be taken which are conducive to preserve "real" evidence in substantially the same condition as when originally obtained by the authorities and to shield it against substitution or tampering.

"The purpose of the chain of custody and possession rule is, of course, to vouchsafe assurance that the exhibit has not been altered or tampered with and that there has been no substitution. * * * To meet this burden, the state is not required to exclude every possibility of these occurrences, * * * nor to show that some credible witness retained the exhibit in his personal possession or under constant watch, * * * *Evidence which provides a reasonable assurance that the exhibit is the same and in the same condition meets the test, * * *.*" *State v. Lemon*, 1973, Mo.App., 504 S.W.2d 676 at 684 (emphasis added and citations omitted).

■ Real evidence, like testimonial evidence, is open to attack by way of impeachment of its value, and De minimis "breaks" in the chain of custody go to the weight to be given such evidence, rather than to disqualify it entirely for admissibility.

■ In this case, Officer Charles testified that the materials which made up the exhibit appeared to be the same after the

3. The defendant's other contention, that these observations, made by the presiding Justice in the absence of the jury, in connection with the issue of the integrity of the exhibit, demonstrated such personal prejudice against the defendants and such lack of impartiality as to stamp his ruling erroneous per se, is without merit. No objections were made to the Justice's conduct at trial and this Court will not entertain this alleged claim of error when raised for the first time on appeal, and where the error, if any, did not affect the substantial rights of the parties. Rule 52(b) M.R. Crim.P.

luncheon recess as they were before. As stated in *State v. Clukey,* 1951, 147 Me. 123, 128, 83 A.2d 568, 570:

"The objections raised by the respondent to the introduction of the exhibits if they have any merit, go solely to the weight to be given to the exhibits. They were properly admitted."

## II. *The admissibility of the coins taken from the person of Cress*

Cress raises no constitutional issue regarding the search of his person which produced coins to the value of $18.21,[4] but rather questions their admissibility in evidence on the theory that they were not identified or positively associated with the break at the V.F.W. building.

A similar contention was rejected in *State v. Small,* supra, and in *State v. Mimmovich,* supra. In *Mimmovich,* this Court said:

"The coins found on [the defendants] were reasonably relevant to the charges of breaking, entering, and larceny in the nighttime and properly admissible as evidence against them . . . ." 284 A.2d at 286.

The fact that the defendants were seen in the vicinity of the breaking and entering (Cress dropping the paper bag later found to contain a muscular dystrophy container similar to one missing from the V.F.W. building), and the fact that a large quantity of coinage was taken in the burglary, coupled with the possession by Cress on the search of his person of a significantly large number of coins, give rise to a permissible circumstantial inference that the seized money was part of the loot taken from the premises where the breaking and entering had occurred. These coins were relevant evidence as to the identity of the burglars.

## III. *The admissibility of the coins taken from the automobile*

Both defendants contend that State's exhibit # 2, the blue dish containing the coins in the amount of $14.00, should not have been admitted in evidence, since, it is argued, they were the fruits of an illegal warrantless search made against the principles stated in *Mapp v. Ohio,* 1961, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081. The State seeks justification for the intrusion on the basis that no search was involved. The police activity is characterized as a routine administrative inventory, a standard police procedure designed to ascertain the nature of the property in custody. We rest our decision on this issue upon principles governing the reasonableness of the search under constitutional requirements, and not upon any theory of administrative inventory by the police.[5]

■ The Fourth Amendment to the Constitution of the United States, made applicable to the States through the Fourteenth Amendment, is fully applicable to the police activity under scrutiny, even though the officers may have intended the inspection of the automobile's interior as a mere inventory and had no actual purpose to seek the fruits, instrumentalities or evidence of criminal activity. *State v. Richards,* 1972, Me., 296 A.2d 129, 134–135. We believe, however, that the search was a

---

4. While the constitutional issue is not raised, it may be noted that the search of the person of the defendant Cress may be deemed reasonable as a valid search incident to a lawful custodial arrest within the scope of the principles enunciated in *State v. Estabrook,* 1968, Me., 241 A.2d 880. See also *United States v. Robinson,* 1973, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427; *Gustafson v. Florida,* 1973, 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456; *United States v. Edwards,* 1974, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771; *State v. Dubay,* 1974, Me., 313 A.2d 908; *State*

*v. Dubay,* 1975, Me., 338 A.2d 797; *State of Maine v. Little and Brewer,* 1975, Me., 343 A.2d 179.

5. While we express no opinion on the constitutional viability of the doctrine of administrative inventory searches as such, we take notice of the wide divergence of opinion respecting the permissible scope of such police procedures. See Annotation, Lawfulness of "Inventory Search" of Motor Vehicle Impounded by Police, 1973, 48 A.L.R.3d 537.

reasonable search within constitutional restrictions under the principles enunciated in *Chambers v. Maroney*, 1970, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419.

■ The white station wagon which the police officers searched at the station house parking lot "for purposes of inventory" could properly have been searched without a warrant, shortly prior thereto, on Temple Street at the time the defendant Cress was removed from the car following his arrest for breaking and entering the V.F.W. building with intent to commit larceny. *Carroll v. United States,* 1924, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543. Probable cause then existed to support a reasonable belief by an ordinary prudent and conscientious person that the automobile had been used in the burglary and probably contained some fruits of the burglary, possibly instrumentalities with which the security of the building was breached or other evidence of a criminal nature in connection therewith. The automobile registered to the defendant Shone was driven by the defendant Cress from the V.F.W. parking lot to the point on Temple Street where Cress was placed under arrest. By that time, the police knew that the crime of breaking and entering had taken place and that a muscular dystrophy container with its coinage contents had been stolen therefrom. A police officer, of his own personal observation, had already tied the automobile and the two defendants, whom he recognized at the V.F.W. parking lot, with the burglary by reason of actually seeing the defendant · Cress drop the brown paper bag which the officer thereafter examined to find therein the remnants of the crushed muscular dystrophy collection plastic box, stripped of its alleged amassed currency.

The essence of probable cause is reasonable ground for belief of guilt and, in the case of a warrantless search, the information must be such as would lead a reasonable and cautious person to believe that the search would disclose criminal conduct or things tending to establish the commission of crime or the identity of the perpetrator thereof. *State v. Walker,* 1975, Me., 341 A.2d 700.

"Probable cause rests on probabilities and is objective in nature. It is not whether particular officers thought or believed they had cause to arrest or search. It is rather whether on the basis of facts known or reasonably believed by him, an ordinarily prudent and cautious officer would have probable cause to arrest or search." *State v. Heald,* 1973, Me., 314 A.2d 820, 828.

■ The mistaken subjective opinion of police officers making the search as to the source of their authority for the same is not determinative of the lawfulness of the search. *State v. Koucoules,* 1974, Me., 343 A.2d 860.

In *State v. Brochu,* 1967, Me., 237 A.2d 418, the officers' erroneous belief that they had a valid consent to search did not render the search unlawful and unreasonable, since they were in possession of a valid search warrant, although they did not purport to act under it.

In *State v. Thibodeau,* 1974, Me., 317 A.2d 172, a search was held to be reasonable and proper under a valid consent to search, although the police were acting pursuant to the authority of a defective warrant.

■ Thus, the mere fact that the Waterville police ascribed their authority to search the Shone automobile, while under the control of the defendant Cress, on the theory that they had the right to take an administrative inventory of the contents of the vehicle, would not render the search unreasonable and unlawful, if it was otherwise constitutionally permissible on the ground of probable cause.

■ But, a warrantless search, even in a context of probable cause, may not be justified if, in addition thereto, the existing circumstances do not present a situation of exigency, requiring immediate search and seizure, or both, to prevent likelihood of removal, concealment, de-

struction or loss of the articles lawfully subject to seizure. *State v. Stone,* 1972, Me., 294 A.2d 683; *State v. Walker,* supra.

Conceding the police had probable cause to search the automobile on the street at the time of the arrest of Cress and that a search at that time would have satisfied the requirements of exigent circumstances under the doctrine espoused by *Carroll v. United States,* supra, does the removal of the vehicle by the police, through the services of Miss Malone rendered at their request, to the station house parking lot where the search was conducted, so alter the situation as to take away from the then existing circumstances the characteristics of exigency which adhered to them prior to the removal?

In *Chambers v. Maroney,* supra, the occupants of the car were arrested on the road and the car driven to the police station before it was thoroughly searched for fruits and instrumentalities of a robbery. In *Chambers,* the Supreme Court of the United States stated:

"Arguably, because of the preference for a magistrate's judgment, only the immobilization of the car should be permitted until a search warrant is obtained; arguably, only the 'lesser' intrusion is permissible until the magistrate authorizes the 'greater.' But which is the 'greater' and which the 'lesser' intrusion is itself a debatable question and the answer may depend on a variety of circumstances. For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. *Given probable cause to search, either course is reasonable under the Fourth Amendment.*" (Emphasis ours)

On the facts of the instant case, as well expressed in *Chambers,* "the blue [white] station wagon could have been searched on the spot [on Temple Street] when it was stopped since there was [then] probable cause to search and it was a fleeting target for a search. *The probable-cause factor still obtained at the station house and so did the mobility of the car* . . . ." (Emphasis provided)

Since they had probable cause to believe that the station wagon was itself an instrumentality of the breaking and entering and as such would likely contain evidence of the crime, the police were justified in making a warrantless search of the automobile at the station house immediately following the booking of the defendants. Cf. *State v. Little and Brewer,* supra.

█ It is apparent from the facts of this case that the automobile was continually in the custody of the Waterville police from the time the defendant Cress was arrested. While the vehicle was driven to the police parking lot by Miss Malone, it is clear she was acting, albeit involuntarily, as an agent of the police. The automobile was at all times during the transfer from Temple Street to the station house under close escort by police cruisers. Once the accused had been lawfully arrested and were in custody, their automobile, which was subject to search at the time and place of arrest of the defendant Cress had been removed to police headquarters under police direction, could be lawfully searched and incriminating evidence seized without a warrant, where the search and seizure were made immediately after the administrative processing of the parties.

IV. *Sufficiency of the evidence*

█ Both defendants contend that the State failed to meet its burden of proof of guilt beyond a reasonable doubt. We have carefully reviewed the evidence in the record and this claim is totally without merit.

The entry will be

Appeals denied.

All Justices concurring.