**STATE of Maine**

v.

**Robert J. FRANCO.**

Supreme Judicial Court of Maine.

Nov. 19, 1976.

---

---

Robert S. Raymond, Asst. Atty. Gen., Richard S. Cohen, Deputy Atty. Gen., Augusta, for plaintiff.

Libhart and Ferris by Joel Dearborn, Brewer, Marshall A. Stern, Jerome B. Goldsmith, Bangor, for defendant.

Before DUFRESNE, C. J., and POMEROY, WERNICK and ARCHIBALD, JJ.

WERNICK, Justice.

An indictment returned on January 7, 1974, to the Superior Court (Penobscot County) charged that by killing Theodore J. Townsend, defendant Robert J. Franco had committed the crime of felonious homicide punishable as murder. Defendant was found guilty as charged by a jury and has appealed from the judgment of conviction entered on the verdict.

The appeal, which we deny, raises several issues pertaining to the admissibility of particular evidence and the sufficiency of the totality of the evidence to support the conviction.

The following facts could justifiably have been found by the jury.

In August, 1973, defendant made a deal with Theodore Townsend and William McAllister to give them fifty pounds of marijuana on "consignment." Several days after delivery, the marijuana disappeared from the McAllister home and defendant was never paid. Defendant became increasingly disturbed because the marijuana did not reappear.

By late September and early October, defendant threatened McAllister and another person, one Taylor, with a gun, demanding to know what had happened to the marijuana. Eventually, having concluded (apparently without factual basis) that Townsend had stolen the marijuana, defendant began to tell a number of his friends that he intended to "injure", "shoot", or "kill" Townsend if he did not get back his marijuana.

On November 2, 1973, the day before Townsend was killed, defendant, accompanied by his friend Thomas Peatie, drove from Connecticut to Lincoln, Maine, to spend the weekend with defendant's girlfriend, Sharon Cunningham. Defendant told Peatie that he was going to get the money Townsend owed him for the drugs. The next morning, defendant and Peatie engaged in some shooting practice in Lincoln, using a cedar stump as a target. During the day, they went to Bangor and attempted to find Townsend.

That night, defendant told Peatie that he wanted "really" to hurt Townsend either by using an ax handle or by shooting him in the leg. Defendant, carrying the 22 magnum pistol used earlier in target practice, and Peatie, with a 38 caliber pistol, then drove to Townsend's apartment on Spring Street in Bangor. When Townsend came out of the building, defendant confronted him, demanded to be paid, and hit him with the ax handle. Townsend then started running away, and defendant drew his gun and fired twice. Townsend fell, as defendant and Peatie ran to their car. Townsend then arose, however, and as he began to run away, defendant thinking that he had missed, fired a third shot. Townsend again fell to the ground.

Later that night, back at the Cunningham house, defendant "nervously" hid the guns in the cellar. The next day, when defendant and Peatie became aware that Sharon Cunningham had mistakenly believed she had seen Townsend's car, they immediately became upset and went into the cellar. Defendant told Sharon's brother that they had roughed up someone in Bangor in order to collect some money.

On Monday morning, defendant and Peatie arose early and bought a newspaper

which reported that Townsend was dead. Immediately, they "nervously" began packing. Defendant got the 22 pistol from the cellar and put it in a paper bag. Sharon Cunningham then took defendant and Peatie to a wooded area where Peatie disposed of the bag containing the gun. Defendant, then obviously upset, admitted to Sharon: "I shot Teddy (Townsend), and I didn't mean to." Shortly thereafter, defendant and Peatie left the State.

The deceased was identified by his father as "Theodore J. Townsend." An autopsy revealed that the cause of death was a gunshot wound. Fragments of a 22 magnum bullet were taken from Townsend's body.

Defendant raises three issues on appeal concerning admissibility of evidence.

The first point involves testimony relating to a 22 magnum bullet allegedly extracted from a log found in Lincoln. Although the bullet itself was never admitted in evidence (because there had been a break in the chain of custody of the log), defendant argues that the admission in evidence of testimony about the bullet prejudiced defendant since proof was lacking to connect defendant with the bullet.

In his direct examination of the State's bullet identification expert, the prosecutor asked a number of questions concerning the bullet fragments removed from the body of the deceased. On cross-examination, defense counsel elicited, for the first time, testimony that a "second bullet", also examined by the expert, "matched" the bullet found in the deceased's body. Defense counsel asked a number of questions with regard to the significance of these matching bullets, the questions emphasizing that the expert did not know where the second bullet was discovered. On redirect exami-

nation, over defendant's objection, the expert indicated that he received a tree stump at the same time he received the second bullet. Later in the trial, the State attempted to clarify this testimony by a showing that the second bullet was taken from a tree stump found in the area where defendant and Peatie had engaged in shooting practice on the day of the homicide.

■ Even if we accept defendant's contention that the State's evidence concerning the second bullet was irrelevant and immaterial because the State failed to connect defendant to the second bullet, we nevertheless reject the argument that the admission of the evidence was error requiring reversal of the conviction.

■ When one party introduces irrelevant and prejudicial evidence, even though it is admitted without objection, it is within the presiding Justice's discretion to permit the other party to introduce evidence to remove the unfair prejudice which could otherwise be produced by the original evidence. *State v. Witham,* 72 Me. 531 (1881).[1] In the instant case, defense counsel's persistent questioning of the bullet expert concerning the unexplained existence of a second matching bullet opened the door to the introduction of evidence attempting to explain any doubts with regard to the matching bullet.[2]

Further, the probative value of the testimony concerning the second bullet outweighed the danger of prejudice. Although the murder weapon was never found, the bullet removed from Townsend's body was identified as fired from a 22 magnum pistol. Peatie testified that defendant used a 22 magnum to practice shooting at a cedar log in Lincoln and to kill Townsend later that same day. On in-

---

1. While the *Witham* case states that such evidence may be introduced to "directly and strictly contradict" the original, it fulfills the purpose of this approach to allow any evidence necessary to remove the prejudice and clarify doubt.

2. Defense counsel initially objected to ,the testimony about the log but did not move to strike that testimony when the trial Justice ruled ,that, because of the break in the chain of custody, the bullet itself would be excluded.

formation also supplied by Peatie, Officers Mandel and Vigue located and seized a cedar log in Lincoln which appeared to have been used for target practice. The log was later given to Officer Stevens who transported it from Bangor to Augusta. In Augusta, Officers Stevens and Vigue removed a bullet from a large cedar log. The bullet taken from the log was given to a bullet expert who, with "absolute certainity", identified the bullet as fired from the same gun as was the bullet removed from Townsend's body.

 The evidence tended to prove a connection between the defendant and the 22 magnum which was used to kill Townsend. While there was a one day break in the chain of the log's custody during its transportation by Officer Stevens to Augusta, this minor break in the chain of custody goes to the weight of the evidence, not its admissibility. *State v. Cress*, Me., 344 A.2d 57, 61 (1975). The purpose of the chain of custody requirement is to provide reasonable assurance that the exhibit is the same and in the same condition as when originally found, *State v. Cress*, supra. Officer Vigue's removal of a bullet from a large cedar log, after the break in the chain of custody, and only one day after his discovery (in Lincoln) of a cedar log supposedly used by the defendant for target practice, authenticated the evidence by virtue of Vigue's implicit recognition of the significance and distinctive characteristics of the log. Moreover, the inherent self-authenticating characteristics of the two matching bullets, as made evident by the expert's testimony that every gun leaves its own unique markings on its bullets when fired, substantiates the physical continuity of the evidence. Since the murder weapon was never discovered, it is highly unlikely that the matching bullet could have been fired into the log during the break in the chain of custody.

The presiding Justice did not err, but acted within the appropriate bounds of a sound discretion, in admitting testimony concerning the "second bullet" notwithstanding that he had excluded from evidence the second bullet itself.

As a second point on appeal, defendant argues that the presiding Justice erred in admitting testimony as to admissions allegedly obtained from the defendant in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Defendant's contention specifically relates to statements made by defendant at an initial appearance before a United States Magistrate.[3]

The Magistrate opened the proceedings by reading the charges against the defendant and then advised defendant of his *Miranda* rights.[4] Defendant responded that he fully understood those rights. After he had inquired concerning defendant's indigency, the Magistrate appointed an attorney for defendant, but the attorney was not present at this initial appearance of the defendant. Ten minutes after the *Miranda* warnings, at the conclusion of the proceedings, the Magistrate asked defendant whether he wanted to say anything or ask any questions. Defendant stated that he did not understand how he could be charged with the murder as he had not been in Maine at the time of the alleged murder, and added, as an aside, "I wouldn't kill Teddy anyway, he's a friend of mine." The Magistrate interrupted and again advised defendant that anything he said could be used against him. At trial, the presiding Justice allowed in evidence,

3. Defendant was arrested in Connecticut by an FBI agent and charged with a violation of a federal law—unlawful flight to avoid prosecution based upon a warrant issued in Maine. This federal charge, for which defendant was originally arraigned, was subsequently dismissed.

4. Defendant had also been fully warned of his *Miranda* rights, both orally and in writing, by the arresting FBI agent. At that time, defendant also indicated that he understood those rights.

over defendant's objection, the above-described statement made by defendant to the Magistrate.

■ We find no error in the ruling. Even if *Miranda* is applicable to the instant situation which involves the conduct of a governmental official other than a police officer—a question upon which we presently intimate no opinion,—neither the letter nor spirit of *Miranda* was violated by the single question, general and neutral in nature, asked by the impartial Magistrate. Moreover, defendant's voluntary statement came only minutes after defendant indicated in response to the Magistrate's warnings that he understood his *Miranda* rights.

Defendant's third claim of reversible error concerns the admissibility of statements made prior to trial by a witness for the State. The circumstances underlying the alleged error occurred when Elizabeth Hodges, on direct examination, testified to certain threats she had heard defendant make concerning the deceased. On cross-examination, defense counsel first used particular portions of a summary of a prior police interview with Hodges, in an attempt to impeach the credibility of the witness. Immediately before and after this specific cross-examination with regard to these prior statements and without making clear transitions in questioning, defense counsel conducted the following cross-examination:

"Q. . . . Now, didn't you tell . . . [your friends] some stories regarding Mr. Franco about firing a shot at Teddy in his apartment?

"A. Franco? No.

"Q. You never said that?

"A. I don't know—no.

"Q. You never told them that you were in the presence of Ted Townsend when that happened?

"A. That he shot at Ted?

"Q. Yes.

"A. No."

■ On redirect examination, the State, in reference to the apparent existence of inconsistent statements concerning whether defendant threatened to "kill" or only to "hurt" Townsend, called the attention of the witness to a previously overlooked portion of the prior statements. The witness then clarified for the jury that her prior statements were, in fact, consistent with her present testimony.[5] These prior consistent statments were admissible, at that time not for the truth of the matter asserted therein, but as verbal acts tending to corroborate the testimony of the witness and as supplying complete statements to rebut any inference regarding the existence of inconsistent statements. See: *State v. Galloway,* Me., 247 A.2d 104 (1968); *State v. Lizotte,* Me., 249 A.2d 874 (1969).

■ The State, however, went one step further and introduced the *entire* summary of the prior statements of the witness. The presiding Justice allowed this evidence on the ground that defense counsel had suggested (in the above-quoted questions) that the witness had made particular prior statements which the witness now denied making. These insinuations by defense counsel, sandwiched between references to prior recorded statements of the witness, made the contents of the prior statements a proper inquiry for the jury. The only way the jury could determine whether such inconsistencies actually existed was to see a copy of the *entire* statements referred to by defense counsel. In *State v. Pullen,*

---

5. The presiding Justice properly instructed that prior inconsistent testimony is admissible only to impeach the credibility of the witness and not to establish the truth of the statements. Compare, also, Rule 801(d)(1), Maine Rules of Evidence which became effective subsequent to the date of the trial.

Me., 266 A.2d 222, 226 (1970), in condemning a similar evidentiary "fishing expedition" which might have either confused the jury or wasted the Court's time, we noted:

> "He [defense counsel] had no right to discredit the witness through unsupportable and indiscriminate implications, even in question form, that the witness may have given contradictory testimony at a previous judicial proceeding, on the mere chance the witness may give answers favorable to the defendant."

We decide, therefore, that in admitting the evidence, the presiding Justice properly exercised a sound judicial discretion to eliminate unfairness and to avoid jury confusion.

■ Finally, defendant challenges the sufficiency of the evidence because of discrepancies in the identification of the deceased and the testimony of Peatie and Cunningham as to the sequence of events on the night Townsend was killed.

The indictment charged that defendant had killed *Theodore* J. Townsend. At trial, however, a doctor testified concerning hospital records in which the victim was identified as *"Dana* Townsend." (emphasis supplied) Moreover, the mother of the deceased person had signed an emergency release form at the hospital authorizing treatment of "Dana K. Townsend" for a gunshot wound. On the other hand, after Townsend had died, his father identified the body as that of "Theodore J. Townsend." Several other witnesses testified that the deceased frequently had used the alias "Dana Townsend" (his brother's name) in order to avoid execution of an arrest warrant issued for him under his true name of "Theodore Townsend."

Defendant also contends that there are discrepancies in the sequence of events on the night of the murder because Peatie testified that he saw defendant shoot Townsend intentionally, while Sharon Cunningham testified that defendant told her he did not mean to shoot Townsend.

■ The resolution of conflicts and inconsistencies in the testimony is a matter for the jury. *State v. Fournier*, Me., 267 A.2d 638, 641 (1970); *State v. Call*, Me., 322 A.2d 64, 66 (1974). The entirety of the evidence was sufficient to warrant a conclusion by the jury that, beyond a reasonable doubt, defendant had killed a person, correctly described as Theodore J. Townsend, in such manner that defendant was guilty, as charged in the indictment, of felonious homicide punishable as murder.

The entry is:

*Appeal denied.*

All Justices concur.

WEATHERBEE and DELAHANTY, JJ., did not sit.