STATE of Maine

v.

Philip WILLIAMS.

Supreme Judicial Court of Maine.

Dec. 29, 1978.

Michael D. Seitzinger (orally), Fernand LaRochelle, Asst. Attys. Gen., Augusta, Thomas E. Delahanty, II, Dist. Atty., Auburn, for plaintiff.

Berman, Berman & Simmons, P. A. by Gary Goldberg (orally), Lewiston, for defendant.

Before McKUSICK, C. J., and POMEROY, WERNICK, ARCHIBALD, GODFREY and NICHOLS, JJ.

NICHOLS, Justice.

Upon a jury trial of four days in Superior Court in Oxford County, the Defendant, Philip Williams, was convicted of conspiracy to commit murder, 17 M.R.S.A. § 951, and of being an accessory before the fact to assault with intent to murder, 17 M.R.S.A. § 2656; 15 M.R.S.A. § 341. The issues which the Defendant raised upon his appeal of those convictions to this Court chiefly concern the admissibility of evidence adduced by the State in that trial.

We deny the appeal.

The pertinent facts can be briefly summarized. On December 30, 1975, Alberta Williams, the Defendant's former wife, was discovered on the side of Route 119 in Hebron. She had sustained crushing blows to the head. Shortly thereafter the Auburn police arrested Earl Woodbury who confessed to the assault and implicated the Defendant. Woodbury subsequently pled guilty to conspiracy to commit murder and assault with intent to murder.

At the Defendant's trial Woodbury and his girlfriend, Sharon Marshall, were the State's principal witnesses. They both testified to conversations in the latter part of 1975 between the Defendant and Woodbury during which the Defendant, they said, promised to pay Woodbury to kill his former wife. Alleged motives for the murder included Defendant's desire to obtain both the proceeds of a life insurance policy on his ex-wife and the custody of their children which had been awarded to her.

The Defendant took the stand in his own defense. He denied procuring, hiring or conspiring with Woodbury to harm or kill his former wife. He further testified that he had never harbored any ill will towards Alberta Williams. Tina Phelps, the Defendant's present wife, then girlfriend, who was present with Marshall at the meetings between Woodbury and the Defendant corroborated the Defendant's story. The Defendant's theory, which he urged at trial, was that Woodbury, a man known for his alcoholic and violent tendencies, attempted to murder the victim in an attempt to appease his girlfriend who was jealous of Woodbury's romantic involvement with Alberta Williams.

Conceding that the State's evidence, if believed, was sufficient to convict him, the Defendant nevertheless asserts that the presiding justice committed errors which prejudiced his substantial rights. M.R. Crim.P. 52(a).

I.

The Defendant at trial unsuccessfully attempted to introduce the testimony of Paul Walsh, who was the victim's landlord in the summer of 1975 and at the time of the assault. Through an offer of proof, the Defendant indicated that Walsh would testify that one day in the summer of 1975 Alberta Williams entered his apartment and announced that "she was scared because Earl Woodbury was chasing her down the tracks." The Defendant represented this testimony to be crucial to his case because it undermined the State's theory that Woodbury would not have assaulted the victim but for the money offered him by the Defendant several months later. The proffered testimony was excluded as hearsay over Defendant's assertion that the statement was admissible as an exception to the hearsay rule either as an "excited utterance" (M.R.Evid. 803(2)), a "present sense impression" (M.R.Evid. 803(1)), or as a declaration of "existing mental, emotional, or physical condition" (M.R.Evid. 803(3)).

The determination whether a statement falls within an exception to the hearsay rule rests with the presiding justice.

His decision will not be reversed except for an abuse of discretion. M.R.Evid. 104(a). *See State v. Sprague,* 135 Me. 470, 475, 199 A. 705 (1938); *Christensen v. Economy Fire & Casualty Co.,* 77 Wis.2d 50, 252 N.W.2d 81, 84 (1977).

■ To be admissible as an "excited utterance" under M.R.Evid. 803(2) the statement must "relate" to a "startling event or condition" and must be made while the declarant is still "under the stress" of the event.[1] The exception is based on the assumption that a person under the influence of a startling event lacks the reflective capacity essential for fabricating; hence, statements made under the sway of such an event are spontaneous and trustworthy. *State v. Ellis,* Me., 297 A.2d 91, 93 (1972).

■ The Defendant and the State differ basically on whether the victim was still excited when she made the statement which the Defendant sought to introduce. The Defendant points to testimony of Walsh in which he stated that the victim appeared "white" and "out-of-breath." The State counters by pointing out other testimony of Walsh who, when asked whether the victim engaged in any activity which suggested that a chase had just occurred, responded that the victim merely sat at a table and said nothing more about Woodbury other than reciting a terse history of their relationship. Apparently she was sufficiently unconcerned that she did not look out of Walsh's window at the railroad track, barely one hundred feet from the apartment. Nor did Walsh testify that the victim looked either scared or excited.

Significantly missing from Walsh's testimony was any evidence of the circumstances of the chase or when it had occurred. Without any of these underlying facts, it was problematic whether the victim's decla-

rations were dominated by the nervous excitement of the event or whether they were the product of conscious reflection. *See State v. Ellis, supra.*[2] We cannot say that the presiding justice abused his discretion in excluding the proffered testimony as an excited utterance.

■ The Defendant's alternative arguments, that the victim's statement may be viewed either as a present sense impression or as a declaration of existing, mental, emotional, or physical condition, are without merit. Under M.R.Evid. 803(1) a present sense impression is defined as:

> A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter.

The exception is predicated on the notion that "a statement *substantially contemporaneous* to the event being described is most unlikely to be a deliberate or conscious misrepresentation." M.R.Evid. 803, Advisers' Note (emphasis supplied).

The victim's statement to Walsh, coming as it did after an undetermined lapse of time from the triggering event, does not possess the indicia of trustworthiness to qualify as a present sense impression.

■ Nor does the victim's statement fall within the parameters of M.R.Evid. 803(3) which in pertinent part provides:

> A statement of the declarant's then existing state of mind, emotion sensation, or physical condition such as intent, plan, motive, design, mental feeling, pain, and bodily health, *but not including a statement of memory or belief to prove the fact remembered or believed* . . . .. (emphasis supplied).

---

1. M.R.Evid. 803(2) provides, as an exception to the hearsay rule:

 A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

2. In *Ellis,* under the excited utterance exception, testimony was admitted that the deceased went to a neighbor's house and exclaimed that

there was a man across the street with a gun who threatened to kill her if she and her children didn't accompany him. We found the admission of such evidence to have been in error because, *inter alia,* there was no evidence concerning the circumstances surrounding the event or when it occurred. In that respect *Ellis* provides a striking parallel to the case before us.

The emphasized language codifies the result of *Shepard v. United States,* 290 U.S. 96, 105–06, 54 S.Ct. 22, 78 L.Ed. 196 (1933) where the United States Supreme Court found that the deceased's statement, "Dr. Shepard has poisoned me," was inadmissible to prove the past act. By analogy, this victim's statement that Woodbury was chasing her is inadmissible under M.R.Evid. 803(3) as a basis for inferring the happening of the past event. As stated by Mr. Justice Cardozo in *Shepard:*

> Declarations of intention, casting light upon the future, have been sharply distinguished from declarations of memory, pointing backwards to the past. There would be an end, or nearly that, to the rule against hearsay if the distinction were ignored. *Id.* at 105–06, 54 S.Ct. at 26.

No different result occurs merely because the victim also stated that she had a present fear, for such fear is tantamount to remembering the prior conduct of Woodbury threatening her with harm. *See United States v. Kennedy,* 291 F.2d 457 (2d Cir. 1961) (Friendly, J.); 4 Weinstein, Evidence § 803(3)(05) (1977).

## II.

■ To rehabilitate the credibility of Woodbury and his girlfriend the State introduced prior consistent statements that these witnesses had made. Focusing particularly on statements made by Marshall to the Defendant's attorney, the Defendant asserts that the scope of the prior consistent statements exceeded the permissible limits of M.R.Evid. 801(d)(1), which provides in pertinent part:

> A prior consistent statement by the declarant, whether or not under oath, is admissible only to rebut an express or implied charge against him of recent fabrication or improper influence or motive.

The rule is but a codification of what has long been the law in Maine. A prior statement of a witness, consistent with his testimony at trial, is admissible not for its substantive truth but merely to rebut the inference that such statement was a recent fabrication or given with improper motives. *Advisers' Note* to M.R.Evid. 801. *See State v. Franco,* Me., 365 A.2d 807, 812 (1976).

■ The admissibility and scope of a prior consistent statement, rests in the sound discretion of the presiding justice, and depends upon the nature and extent of impeachment efforts. *See State v. Lizotte,* Me., 249 A.2d 874, 880–881 (1969).

■ On direct examination, Woodbury's girlfriend gave elaborate and detailed testimony concerning the substance of conversations between Woodbury and the Defendant which corroborated Woodbury's testimony. Phelps and another defense witness, Forrest Fisher, testified that, while waiting to appear before the Grand Jury, Woodbury's girlfriend told them that the Defendant had nothing to do with the crime. Moreover, on cross-examination, she admitted that she had lied for Woodbury, that she would follow his commands, and that she would engage in criminal activity at his suggestion. Such testimony undeniably created a rather strong inference that her testimony at trial was a recent fabrication for Woodbury's sake.

Given such an overall attack on the girlfriend's credibility, the introduction of statements consistent with her testimony at trial and made to the Defendant's attorney prior in time to the inconsistent statements were highly relevant in shedding light on her credibility. Although we recognize that the impeachment of a witness does not give the other party a license merely to to bolster its case, *see* Annot., 75 ALR 2d 909, 957 (1961), the statements made by this girlfriend to the Defendant's attorney were in a broad sense consistent with her impeached testimony of a conspiracy between Woodbury and the Defendant. Subject to the presiding justice's discretion, such testimony was admissible for the jury's evaluation and determination.

## III.

The Defendant asserts prejudicial error in the admission of a document which allegedly violated the best evidence rule.

During the State's case, Woodbury stated that his former wife smuggled out of jail a note that he wrote to the Defendant, demanding $500.00 so that he could obtain an attorney. Woodbury allegedly threatened to testify against the Defendant unless he received the money. When the Defendant refused to pay, Woodbury's former wife destroyed the note. During the Defendant's direct examination he testified to attempts to obtain the note. On cross-examination he was shown a summary of the note apparently prepared from Woodbury's ex-wife's recollection. Asked if this summary, which corresponded to Woodbury's testimony, was correct, the Defendant responded that for $500.00 Woodbury promised to exonerate the Defendant. On rebuttal Woodbury testified that the document's language was the exact wording that he had used in his note to the Defendant. Over the Defendant's objection the summary was introduced into evidence.

The Defendant does not challenge either the testimony relating to the note as hearsay, without proper foundation, or on any other basis. His sole objection is that the introduction of the summary of the note is not permissible secondary evidence for purposes of the best evidence rule. Thus postured, his claim is without merit.

Under the best evidence rule: "To prove the content of a writing . . . the original writing . . . is required . . . ." M.R.Evid. 1002. If the original has been lost or destroyed, "other evidence of the contents . . . is admissible" unless the proponent has lost or destroyed such original in bad faith. M.R.Evid. 1004(1).[3]

The note was "an event which occurred in writing." See R. Field and P. Murray, Maine Evidence § 1002.1 (1976). Therefore, proof of its loss or destruction was a condition precedent to the introduction of "other evidence," that is, of secondary evidence. Having satisfied the presiding justice that Woodbury's former wife destroyed the note, without any intimation of bad faith, the State was free to introduce "other evidence." See Morgan v. Paine, supra.

Secondary evidence is all evidence which does not qualify as primary evidence. Pettit v. Campbell, Tex.Civ.App., 149 S.W.2d 633 (1941). Once the requirements of M.R.Evid. 1004 were met, any type of secondary evidence, not otherwise inadmissible, becomes admissible. The oral testimony of Woodbury and the Defendant, see R. Field and P. Murray, Maine Evidence § 1004, as well as the summary of the note, see Sylvania Electric Products, Inc. v. Flanagan, 352 F.2d 1005 (1st Cir. 1965); 5 Weinstein, Evidence § 1006(05) (1977), were admissible in the absence of any other objection, as evidence of the contents of the unavailable original. That this evidence may not be credible does not affect its admissibility, but only its weight. The weight is a matter for the trier of fact to resolve. 5 Weinstein, Evidence § 1004(01) (1977).[4]

## IV.

As part of its case-in-chief, the State presented the testimony of James Williams, the Defendant's brother. Over objection the brother testified that while the Defendant was in jail, he asked him to take custody of the children so that the State would not be able to demonstrate that the children were a motive for the assault. Upon appeal, Defendant asserts that the introduction of testimony indicating that he would be willing to give up his children to "beat" criminal charges was so

---

**3.** In pertinent part, M.R.Evid. 1004 provides:
The original is not required, and other evidence of the contents of a writing . . . is admissible if:
1) All originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith . . . ..

**4.** Defendant's reliance upon Morgan v. Paine, supra, is entirely misplaced. There we found inadmissible a summary sheet for an open account. The introduction of the summary sheet was reversible error, not because it violated the best evidence rule, but because the summary was inadmissible hearsay, a question not before us in the case at bar.

highly prejudicial as to constitute reversible error.

Under M.R.Evid. 403 evidence which is relevant "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." The instant testimony was, quite obviously, indicative of the Defendant's possible involvement in the assault on his former wife. Coming from Defendant's brother the jury might be more apt to believe the testimony than the testimony that it had heard from Woodbury, a co-conspirator, and his girlfriend. The presiding justice did not abuse his broad discretion in admitting such testimony. *See State v. Hurd,* Me., 360 A.2d 525, 527 (1976).

## V.

 The Defendant asserts that his attempt to impeach the credibility of Woodbury was thwarted when the court instructed the jury that Woodbury's "deal" with the prosecutorial authorities did not obligate Woodbury to testify against the Defendant.

On cross-examination, the Defendant elicited from Woodbury testimony that he had agreed to testify against the Defendant in return for a favorable sentencing recommendation from the Attorney General's office in Woodbury's case. The Defendant's cross-examination of Woodbury, concerning both the existence of an agreement and the extent to which Woodbury expected to benefit by such a deal, probative as it was on the issue of Woodbury's possible bias, was not in the least impaired. *See State v. Larrabee,* Me., 377 A.2d 463, 466 (1977). Contrary to Defendant's assertion, the presiding justice did not undermine the Defendant's effort to impeach Woodbury's credibility, but appropriately instructed the jury to consider any agreement entered into between the State and Woodbury in assessing the witness' credibility. *See State v. Hume,* 146 Me. 129, 139–140, 78 A.2d 496 (1951).

 Of course, Woodbury's guilty plea to conspiracy to commit murder and assault with intent to murder operated as a waiver

of the privilege against self-incrimination as to those offenses. *Boykin v. Alabama,* 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969); *Namet v. United States,* 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963); *see Cote v. State,* Me., 286 A.2d 868 (1972). Under pain of contempt of court, *see State v. Hanson,* Me., 342 A.2d 300 (1975), and consistent with the requirements of 15 M.R.S.A. § 1314–A, Woodbury could have been compelled to testify as to the crimes in question, *see* Annot., 9 ALR 3rd 990 (1966), had he chosen not to testify voluntarily. Nothing in the presiding justice's instructions suggests otherwise. The Defendant takes nothing from this issue.

## VI.

Relying upon *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Defendant alleges that certain testimony of Martin Greely, a police detective, and of Woodbury violated his right to confrontation.

As a rebuttal witness, Greely testified to Woodbury's confession, which plainly implicated the Defendant. Greely's testimony was not introduced for the truth of the matter but as a prior consistent statement to rebut the inference that Woodbury's story was a recent fabrication. M.R.Evid. 801(d)(1). Woodbury, also called in rebuttal, testified to conversations with Lawrence MacDonald, a one-time brother-in-law of Woodbury. Woodbury's testimony that MacDonald, on behalf of the Defendant, offered him money not to testify was again introduced not for its truth, but as a prior inconsistent statement to impeach the credibility of MacDonald.

Defendant alleges that the introduction of Greely's and Woodbury's testimony was a *Bruton* violation because they were statements of a co-conspirator made after the conspiracy terminated and which implicated the Defendant, a fellow co-conspirator.

 Woodbury's testimony as to what MacDonald told him cannot be considered a "statement of a co-conspirator." In any event, the introduction of a prior

inconsistent statement does not offend the Sixth Amendment. *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970).

■ No *Bruton* violation occurred with respect to Greely's testimony. In *Bruton* the appellant's Sixth Amendment right to confrontation was impermissibly impaired when a confession of one co-defendant, expressly implicating the appellant (a co-defendant), was admitted into evidence at a joint trial where the confessing co-defendant did not take the stand and hence could not be cross-examined. However, we have heretofore observed that where the confessing co-defendant is available at trial for cross-examination, his co-defendant's confrontation is fully satisfied. *See State v. Berube*, 297 A.2d 884, 888 (1972); *State v. Wing*, Me., 294 A.2d 418, 423 (1972).

The Defendant takes nothing from this issue.

## VII.

The Defendant alleges that conspiracy to commit murder is a lesser included offense within the crime of accessory before the fact to assault with intent to murder, thereby precluding his conviction for both offenses. Alternatively, Defendant argues that his conviction for both offenses violated established principles of collateral estoppel and merger and also the doctrine often known as "the Wharton rule."

■ Article I, § 8 of the Maine Constitution states, "No person, for the same offence, shall be twice put in jeopardy of life or limb." The double jeopardy clause of the Fifth Amendment, applicable to the states through the Fourteenth Amendment, *Benton v. Maryland*, 395 U.S. 784, 794–796, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969) provides, in much the same language, that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb . . . ."

For double jeopardy purposes the term "same offence" does not merely apply to the situation where separate statutory offenses contain the identical elements.

*Brown v. Ohio*, 432 U.S. 161, 164, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977). It also protects against conviction for two offenses, one of which is necessarily included in the other. *Newell v. State*, Me., 371 A.2d 118, 119 (1977). As we observed in *State v. Leeman*, Me., 291 A.2d 709, 711 (1972):

> To be necessarily included in the greater offense, the lesser offense must be such that it is impossible to commit the greater without having committed the lesser.

Conversely, if each offense requires proof of an additional element which the other does not require, conviction for both crimes is not barred by the double jeopardy clause. *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

■ In the case at bar it is evident that conspiracy to commit murder is not a lesser included offense of accessory before the fact to assault with intent to murder.

In pertinent part, 17 M.R.S.A. § 951 reads:

> If 2 or more persons conspire and *agree* together, with the fraudulent or malicious intent wrongfully or wickedly . . . to commit a crime . . . they are guilty of a conspiracy. (Emphasis supplied).

Central to a conspiracy is an agreement to commit a crime. *See State v. Chick*, Me., 263 A.2d 71, 75 (1970). By contrast, our accessory statute, 15 M.R.S.A. § 341, then in force, provided:

> Whoever aids in the commission of a felony, or is accessory thereto before the fact, by counseling, hiring or otherwise procuring the same shall be punished in the manner prescribed for the punishment of the principal felon.

*Cf.* 17–A M.R.S.A. § 57 (eff. May 1, 1976).

■ To be convicted as an accessory before the fact one must aid, command, counsel, procure, or encourage the commission of a crime without being actually or constructively present at such crime. *State v. Thibodeau*, Me., 353 A.2d 595, 604–606 (1976); *State v. Mower*, Me., 317 A.2d 807, 811 (1974).

 It is, therefore, possible to aid or abet in the commission of a crime without at the same time having agreed to commit such crime. As stated by the United States Supreme Court:

> Aiding, abetting, and counseling are not terms which presuppose the existence of an agreement. Those terms have a broader application, making the defendant a principal when he consciously shares in a criminal act, regardless of the existence of a conspiracy. *Pereira v. United States*, 347 U.S. 1, 11, 74 S.Ct. 358, 98 L.Ed. 435 (1954).

Accord: *Ottomano v. United States*, 468 F.2d 269, 271 (1st Cir. 1972); *United States v. Tropiano*, 418 F.2d 1069, 1083 (2d Cir. 1969) cert. denied 397 U.S. 1021, 90 S.Ct. 1262, 25 L.Ed.2d 530, 1970. This rule is merely an offshoot of the well-established principle that a conspiracy, as an inchoate offense, and the completed substantive offense are separate crimes. *Pereira v. United States, supra*; *Pinkerton v. United States*, 328 U.S. 640, 643–644, 66 S.Ct. 1180, 90 L.Ed. 1489 (1945) (and cases cited therein).

 Because conspiring is not a lessor included offense of aiding and abetting, in the case before us the double jeopardy provision does not bar the Defendant's conviction of conspiracy to commit murder and of being an accessory before the fact to assault with intent to murder.

The Defendant argues that even if conspiracy and accessory before the fact theoretically contain different elements, in the context of the instant trial, the issues presented were identical. Drawing on the collateral estoppel principle of *Ashe v. Swenson*, 397 U.S. 436, 442–444, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), the Defendant alleges that he should have been convicted of only one crime.

 In the criminal realm the doctrine of collateral estoppel provides that a defendant cannot be convicted of a second offense after being acquitted of a first offense if such acquittal necessarily resulted in a factual finding favorable to the Defendant on an element essential to the second offense. *Sealfon v. United States*, 332 U.S. 575, 578–580, 68 S.Ct. 237, 92 L.Ed. 180 (1948). Where there was never a factual finding favorable to the Defendant, the rule simply has no applicability. *Cf. Ottomano v. United States, supra*; *United States v. Tierney*, 424 F.2d 643 (9th Cir. 1970) (acquittals of conspiracy did not preclude subsequent convictions of aiding and abetting).

 In the case before us the Defendant's assertion that conspiracy and the underlying substantive offenses "merged" is without merit. At early common law a conspiracy which constituted a misdemeanor was said to merge with an underlying felony. *See Callanan v. United States*, 364 U.S. 587, 589, 81 S.Ct. 321, 5 L.Ed.2d 312 (1961). Based on archaic common law distinctions, the rule has been universally abandoned. *Pinkerton v. United States, supra*; *Commonwealth v. Stuart*, 207 Mass. 563, 93 N.E. 825, 828 (1911); *see* Annot., 75 ALR 1411 (1931). Even under the ancient common law principles the doctrine would have no applicability in the instant case where the conspiracy is defined as a felony. *State v. Mayberry*, 48 Me. 218, 238 (1859).

 Nor does "the Wharton rule" have any applicability. As an exception to the general rule that a conspiracy and the underlying offense are separate and distinct crimes, this rule has been stated:

> An agreement by two persons to commit a particular crime cannot be prosecuted as a conspiracy when the crime is of such a nature as to necessarily require the participation of two persons for its commission. 1 R. Anderson, Wharton's Criminal Law and Procedure § 89 at 191 (1957).

Murder does not require the participation of two persons. The rule does not apply when the offense could be committed by one of the conspirators alone. W. LaFave & A. Scott, Criminal Law § 62, p. 492 (1972).

## VIII.

 Following his conviction, the Defendant requested to be sentenced under

pre-Code law. *See* 17–A M.R.S.A. § 1(2). He received consecutive sentences of imprisonment of not less than five nor more than ten years for conspiracy to commit murder and of being an accessory before the fact to assault with intent to kill. He now asserts that, even though he was sentenced under pre-Code law, he is entitled to the protection of 17–A M.R.S.A. § 1155(5)(B) because such provision merely satisfied the constitutional requirement of due process. Me.Const. art. I, § 6–A; U.S. Const. amend. XIV.

17–A M.R.S.A. § 1155 in pertinent part states:

> (5) A defendant may not be sentenced to consecutive terms or cumulative fines for more than one crime when:
>
> . . . . .
>
> B) One crime consists only of a conspiracy, attempt, solicitation or other form of preparation to commit, or facilitation of, the other . . . .

Assuming arguendo, that 17–A M.R.S.A. § 1155(5)(B) would now preclude consecutive sentences, such provisions are within the legislative prerogative and are not constitutionally compelled.

The double jeopardy clause protects against multiple punishments for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). However, because a conspiracy and the underlying crime are separate offenses the prohibition of each serving a different end, "consecutive sentences may be imposed for conspiracy and for the underlying crime." *United States v. Feola*, 420 U.S. 671, 693, 95 S.Ct. 1255, 1268, 43 L.Ed.2d 541 (1975). No different result obtains where, as here, the Defendant is convicted of conspiracy and accessorial participation in the substantive offense. *Pereira v. United States*, 347 U.S. 1, 11, 74 S.Ct. 358, 98 L.Ed. 435 (1954).

In 1975, at the time of the offense for which the Defendant was indicted, it was within the inherent power of the court to impose consecutive sentences, *Lizotte v. State*, Me., 279 A.2d 524, 526 (1971),

constrained only by the provisions of 15 M.R.S.A. § 1702. Having expressly stated that the sentences would be served consecutively, the presiding justice fulfilled his obligation under that statute.

There was no error in imposing consecutive sentences.

The entry shall be:

Appeal denied.

Judgment affirmed.

DELAHANTY, J., did not sit.