**UNITED STATES of America, 
Plaintiff-Appellee,**

v.

**Edward L. GREENE and Salvatore Cataldo, Defendants-Appellants.**

No. 77–5674.

United States Court of Appeals, 
Fifth Circuit.

Aug. 21, 1978.

Roy Beene, Houston, Tex., for defendants-appellants.

Kenneth J. Mighell, U. S. Atty., Fort Worth, Tex., Judith A. Shepherd, James A. Rolfe, Asst. U. S. Attys., Dallas, Tex., for plaintiff-appellee.

Before CLARK, FAY and VANCE, Circuit Judges.

FAY, Circuit Judge:

The defendants Greene and Cataldo were convicted in a jury trial of making a materially false statement to a federally insured bank in a loan application in violation of 18 U.S.C. § 1014.[1] The facts underlying this appeal are relatively simple and do not require extensive treatment. Considered in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), the facts reveal that in 1972 Greene and Cataldo became participants in the Witness Protection Program conducted by the Department of Justice in order to avoid incarceration for offenses which they had committed. They testified against various figures associated with organized crime and in return were relocated and furnished with new identities and background information. In 1974 both defendants moved to Dallas, Texas, where they hoped to jointly establish a used car dealership and repair shop. Greene established a banking relationship with the Lakewood Bank and Trust Company of Dallas in early 1974 and the institution subsequently financed the purchase of several automobiles by Greene. In the fall of 1974 Greene and Cataldo approached Mr. Hudson Mead, a loan officer for Lakewood, and sought to secure a loan to finance the dealership-re-

---

1. 18 U.S.C. § 1014 provides:

 Whoever knowingly makes any false statement or report, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of the Reconstruction Finance Corporation, Farm Credit Administration, Federal Crop Insurance Corporation, Farmers' Home Corporation, the Secretary of Agriculture acting through the Farmers' Home Administration, any Federal intermediate credit bank, or any division, officer, or employee thereof, or of any corporation organized under sections 1131–1134m of Title 12, or of any regional agricultural credit corporation established pursuant to law, or of the National Agricultural Credit Corporation, a Federal Home Loan Bank, the Federal Home Loan Bank Board, the Home Owners' Loan Corporation, a Federal Savings and Loan Association, a Federal land bank, a joint-stock loan bank, a Federal land bank association, a Federal Reserve bank, a small business investment company, a Federal credit union, an insured State-chartered credit union, any institution the accounts of which are insured by the Federal Savings and Loan Insurance Corporation, any bank the deposits of which are insured by the Federal Deposit Insurance Corporation, any member of the Federal Home Loan Bank System, the Federal Deposit Insurance Corporation, the Federal Savings and Loan Insurance Corporation, or the Administrator of the National Credit Union Administration, upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, or loan, or any change or extension of any of the same, by renewal, deferment of action or otherwise, or the acceptance, release, or substitution of security therefor, shall be fined not more than $5,000 or imprisoned not more than two years, or both.

pair shop. Greene informed Mead that he had exhausted his capital in purchasing equipment to be used in the repair business and that the loan was needed to supply operating capital. Lakewood agreed to loan the defendants $9,000 and the defendants pledged various pieces of equipment as collateral. Mead requested a copy of the bill of sale evidencing Greene's ownership of the equipment and on October 4, 1974, the defendants supplied a bill of sale showing that the equipment had been purchased one month earlier from Mr. Gary Triano of Arizona Frontier Used Cars in Tucson, Arizona. The defendants subsequently defaulted on the $9,000 obligation and returned to Arizona, taking the collateral with them.

In the spring or early summer of 1975, the defendants were taken to Washington, D.C. by the Department of Justice and threatened with prosecution in this case after it was learned that the bill of sale supplied to Lakewood was forged. The defendants continued to testify on behalf of the government but, to their chagrin, were indicted in this case on March 30, 1977, and trial commenced on September 19, 1977. The government introduced the testimony of Mr. Mead who detailed his banking relationship with Greene and the circumstances leading up to the $9,000 loan, including receipt of the forged bill of sale. Mr. Gary Triano, whose signature purportedly appears on the bill of sale, testified that neither he nor anyone with his consent signed the bill of sale and that the equipment in question had not been purchased from Arizona Frontier Used Cars in Tucson, Arizona. The defendants attempted to establish that their lives were endangered as a result of providing government testimony against organized crime figures and, accordingly, it was necessary to conceal where the equipment had actually been purchased in order to protect themselves. Second, the defense challenged the materiality of the forged bill of sale, contending that ownership of the equipment by the defendants was the crucial factor and that where and from whom the equipment had actually been acquired was immaterial from the bank's perspective. Both defendants were found guilty and this appeal followed.

The defendants raise a panoply of errors on appeal, many of which are ripe for summary disposition. The defendants do, however, raise a serious question as to the propriety of various statements made by the prosecuting attorney during argument to the jury. After careful scrutiny of the entire record, we have concluded that the convictions of the defendants are due to be affirmed.

1. Prosecutorial Argument

The defendants contend that their convictions should be reversed because the prosecutor engaged in improper, prejudicial comment during his argument to the jury. In order that the comments of the prosecutor may be viewed in prospective, we have set out below pertinent portions of the argument which the defendants claim constitute reversible error.

Mr. Rolfe: You're people of common sense, and you're people of intelligence, and I think you can determine from the facts and circumstances of what Mr. Cataldo did and what Mr. Davis said, that that is not the fact. They came down and they both came in and they wanted a loan. They wanted to start, I think it's a reasonable deduction from the evidence based on the millions of dollars that were involved in New York that they wanted to start again . . . . R. Vol. III, 354.

He was driving a 1975 Cadillac in 1974 with a telephone in it. Is Mr. Greene and Mr. Cataldo, are they trying to do right? They commit, I say a grievous crime in New York and New Jersey. You are talking about $10,000,000.00 and $12,000,-000.00.

Mr. Beene: Your Honor, we object. There is no evidence that Mr. Greene and Mr. Cataldo committed the $10,000,000.00. There is approximately some evidence of $23,000.00.

The Court: Follow the evidence.

Mr. Rolfe: I believe that the evidence was that they and their co-conspirators and confederates had in the area of $10,000,000.00 worth of counterfeit stock and I believe that you would recall that we heard mention of United States Postal Service bonds that were stolen that were pledged as collateral to loans for money was taken out of the bank. That there were United States treasury bills pledged at banks. They were caught, they were living high. They were relocated and they began living high again. I think you will recall the gentleman, Mr. Dusenback, they left Dallas. I would say because their quote unquote credit was caving in on them. And where did they go to protect themselves.

Mr. Beene: We object, Your Honor. There is no evidence that their credit was caved in on them. R. Vol. III, 373–374.

Mr. Rolfe: If you are going in for a six month term and get out in two months. They wanted to keep themselves out of the penitentiary up there and keep themselves out of it right now. They want to go to New York and pledge all kinds of stolen stock and security and—

Mr. Beene: I object, Your Honor.

The Court: I overrule the objection.

Mr. Rolfe: And come down here to Dallas, and do the same thing. *They say they work for the Justice Department. I work for the Justice Department and my wife is a school teacher and I am driving a 74 car and these men are driving five of them in 1974. It's ridiculous.* R. Vol. III, 378.

The record reveals that the defendant's attorney entered timely objections to all of the alleged prejudicial comments except the last dealing with the prosecutor's wife and automobiles. Accordingly, we must determine whether this comment constitutes plain error. As to the comments concerning the defendants' activities in New York and New Jersey, and to which the defendant objected, reversal is mandated only if the comments were improper and if they may have affected the substantial rights of the defendants. *United States v. Corbo*, 555 F.2d 1279, 1282 (5th Cir. 1977); *United States v. Bell*, 535 F.2d 886, 888 (5th Cir. 1976).

We simply cannot agree with the contention of the defendants that the prosecutor's comments concerning the offenses committed by the defendants in New York and New Jersey merit reversal. Testimony concerning the prior offenses was first put into evidence by the defendants. The defendants sought to show that various individuals who participated with them in the earlier offenses were dangerous and were likely to have them killed if their true identity in Dallas had been divulged. On cross-examination, the government probed into the nature of the offenses. The defendants did not object. A careful reading of the entire text of the prosecutor's argument concerning the prior offenses convinces us that the prosecutor attempted to elicit a motive for the commission of the offense in question and that he did not probe into these areas for the purpose of establishing that the defendants are "bad men" with the propensity to engage in crime. The record is replete with evidence that the defendants had developed a taste for high living and the prosecutor's argument, when read as a whole, drives this point home. This is simply not a case like *United States v. Garber*, 471 F.2d 212 (5th Cir. 1972), wherein the prosecutor stated in closing argument that the jury could consider prior offenses in determining whether the defendant possessed the disposition to commit the act in question. While we do not necessarily condone reference to prior convictions in closing argument, we do not feel that reference to such acts was improper per se in light of the facts of this case. In any event, even if the reference to the prior offenses in closing argument was improper, we are firmly convinced that due to the overwhelming evidence of guilt, such evidence did not affect the substantial rights of the defendants. *See Corbo* and *Bell, supra*. Because the prejudicial effect, if any, of the comments was slight in relation to the overwhelming evidence of guilt, any impropriety was harmless beyond a reasonable

doubt.[2] *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

 A much more difficult question is presented concerning the prosecutor's statement that "my wife is a school teacher and I am driving a 74 car and these men are driving five of them in 1974. It's ridiculous." The defendants' attorney failed to object to this statement at trial. Accordingly, reversal is proper only if the comment constitutes plain error. F.R.Crim.P. 52(b).[3] In *United States v. Brown*, 548 F.2d 1194, 1207 (5th Cir. 1977), we noted that "plain errors 'are those involving serious deficiencies which affect the fairness, integrity, or public reputation of the judicial proceedings or which constitute obvious error.'" (footnote and citations omitted). To constitute plain error the error must be both obvious and substantial. F.R.Crim.P. 52(b); *Sykes v. United States*, 373 F.2d 607, 612 (5th Cir. 1966). Whether we will recognize an error as plain error must depend upon the facts of each particular case. *Brown, supra*, at 1208; *United States v. Morales*, 477 F.2d 1309, 1315 (5th Cir. 1973). A strict standard is applied in cases where there is a failure to object in order to "'promote efficient judicial administration and to prevent parties from gambling for favorable verdicts and then resorting to appeal on errors that might have easily been corrected by objection at trial.'" (footnote

and citation omitted). *Brown, supra*, at 1207.

 At the outset, we voice extreme displeasure with the conduct of the prosecuting attorney in making the statement in question. The prosecutor's conduct was, in our opinion, unprofessional. There is certainly nothing in the trial testimony concerning the type of automobile owned by the prosecutor nor the nature of his wife's occupation. Moreover, it is difficult to conceive of topics more irrelevant to the issues before the jury. The comment was therefore a clear violation of basic trial procedure. We highly recommend to this particular prosecutor that in future cases he temper his obvious zeal for obtaining a conviction with the basic rules of trial practice. Our inquiry does not terminate, however, with our conclusion that the comment made by the prosecutor was improper. Plain error meriting reversal may be found only if the substantial rights of the defendants were affected by the statement. Rule 52(b) requires at least that much.[4] Viewing this comment with the evidence in its totality, rather than in isolation, we cannot conclude that the statement affected the substantial rights of the defendants. The evidence of guilt was overwhelming, and the prejudicial effect of the statement was slight, if any. This is a case wherein the prosecutor violated a very basic rule of trial practice with very little harm, if any, to the defendants.[5]

2. We acknowledge that we are somewhat surprised that the able trial judge did not give a cautionary instruction to the jury during the charge concerning the proper utilization of evidence of prior offenses. We may rationalize that the trial judge failed to do so because this is not the ordinary case wherein the prior offense testimony is admitted to impeach the defendant after he takes the stand. Neither defendant took the stand in the presence of the jury. In any event, failure to give the cautionary instruction does not affect our conclusion that even if this argument was improper it did not affect the substantial rights of the defendants.

3. Rule 52(b) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

4. For example, the Ninth Circuit will reverse under the plain error rule only if it is "highly

probable that the error materially affected the jury's verdict." *United States v. Dixon*, 562 F.2d 1138, 1143 (9th Cir. 1977).

5. The defendants also contend that the following statement of the prosecuting attorney, to which no objection was made, is false and constitutes plain error meriting reversal:

> . . . because it would be in my opinion, a travesty of justice if they are able to walk out of this Courtroom. They have walked out of every other courtroom they have ever been in, as free men. They are guilty as they are charged.

R. Vol. III, 381.

While this statement is not precisely correct in that the defendants pled guilty to charges before a United States District Court in New Jersey, the record reveals that at the time of trial the defendants had not been incarcerated

## 2. Speedy Trial

The defendants next contend that they were deprived of their Sixth Amendment right to a speedy trial as a result of the delay of approximately twenty-four months between "arrest" [6] and indictment. The defendants were indicted on March 30, 1977 and trial commenced on September 19, 1977. We will therefore consider the entire period between arrest and trial in determining whether the defendants' right to a speedy trial has been violated,[7] applying the four-pronged test of Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). We shall consider and balance (1) the length of the delay (2) the reason for the delay (3) whether the defendant asserted his right to a speedy trial and (4) whether the defendant has suffered prejudice as a result of the delay.

The Court in Wingo noted that the length of delay must be of such a length as to be presumptively prejudicial. This requirement therefore acts as a springboard for consideration of the other factors. The thirty month delay in the case at bar certainly satisfies the requirement of presumptive prejudice.

The government attributes the delay to the need to conduct extensive investigation in order to rebut the defendant's contention that in forging the bill of sale they were relying upon instructions given to them by a United States Marshal or by officials in the Justice Department. The government also contends that the delay resulted from the need to investigate possible civil ramifications of the defendants' acts. However, there is no serious allegation in this record that the prosecutorial delay was occasioned by the intent to obtain a tactical advantage at trial. Although at least part of the delay may be attributed to simple bureaucratic inefficiency, the Court in Wingo pointed out that such a "neutral" reason should be weighed less heavily than deliberate delay. 407 U.S. at 531, 92 S.Ct. 2182; United States v. Palmer, 537 F.2d 1287 (5th Cir. 1976). Nevertheless, we must weigh this factor against the government.

We next look to when the defendant asserted the right to a speedy trial. The record reveals that the defendants first asserted the right on the day trial commenced. This factor is to be weighed heavily against the defendants because it may suggest that little personal hardship was occasioned by the delay. The Supreme Court in Wingo noted that "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." 407 U.S. at 533, 92 S.Ct. at 2193.

Finally, we must consider whether prejudice was suffered by the defendants as a result of the delay. Prejudice may take the form of specific harm to the presentment of a defense or simply personal prejudice, such as the loss of employment and family and the experiencing of public scorn and obloquy occasioned by having to stand accused for a significant period of time. Wingo, supra, at 533, 92 S.Ct. 2182. The defendants assert that their defense was prejudiced because they destroyed business records to avoid divulging their identity upon moving from Texas, and because Mr. Joseph L. Cranwell, an attorney for the Justice Department, died during the delay. The defendants allegedly discussed the

---

or even sentenced on these charges. In any event, this particular comment, even when viewed in isolation, does not merit reversal.

**6.** The "arrest" or "accusatory" stage constitutes the starting point for determining whether the defendant has been denied the right to a speedy trial. Dillingham v. United States, 423 U.S. 64, 96 S.Ct. 303, 46 L.Ed.2d 205 (1975). The defendants contend that they were placed under detention and restraint for commission of the offense charged in the indictment when they were taken to Washington, D. C. in 1975 and threatened with prosecution in this case.

For purposes of this appeal, we will accept, without deciding, that the interpretation of the defendants is correct. In any event, the government does not contest this assertion. The record is unclear as to the exact date in 1975 that the defendants were taken to Washington D. C. but it appears that the trips took place in the spring or early summer of that year.

**7.** See United States v. Palmer, 537 F.2d 1287 (5th Cir. 1976).

$9,000 loan from Lakewood with Cranwell before making application. The defendants further allege that they were personally prejudiced due to the loss of first amendment rights concerning deficiencies in the Witness Relocation Program because they were afraid to speak out against the program.

We have concluded that the defendants have failed to establish that prejudice resulted from the delay. First, according to the testimony of Greene elicited during the motion to dismiss the indictment, the records were destroyed when the defendants moved from Dallas. There is ample evidence in the record to support a finding that the defendants moved from Dallas before the offense was, or reasonably could have been, discovered. Second, there is no evidence in the record as to the exact date when Mr. Cranwell died. It appears that the death occurred sometime in 1975, and, accordingly, it may have been reasonable for the government to have been in the investigatory stage at the time of death. More importantly, the record is unclear as to the nature of the testimony which could have been elicited from Mr. Cranwell. In an affidavit filed by Mr. Beene, attorney for the defendants, Beene stated that "Mr. Cranwell stated to them (the defendants) that as long as no fraud was intended that it was not a crime under their circumstances to state that they obtained the equipment from a source other than where they actually obtained the equipment." R. Vol. I, 53. However, during the motion to dismiss the indictment, Greene testified as follows:

Q: Now, what could Joe Cranwell testify to?

A: Joe could testify to conversations between him and I on various problems we had with the Marshal's Service and the time that I had known him that I was doing business at the Lakewood Bank and Trust and we got along[sic] from the bank and we were putting up body and fender equipment which Sal had accumulated in the body-fender service. We were going to try to get a bill of sale. The equipment was under Sal's real name and some equipment he had purchased in Arizona under the name he was using in Arizona.

When Sal's in-laws went back to New York, they told everybody in New York who he was. He was at that time in the process of relocating from Arizona to Texas. Sal and I were cut off the program at that time. We were having trouble getting Sal to a safe place.

Greene's testimony simply does not adequately support the allegation of prejudice contained in the Beene affidavit. Nor is the record otherwise supportive of the Beene affidavit. Additionally, we are not persuaded by the claim of the defendants that their first amendment rights were chilled by the delay.

In sum, the defendants have established a delay that is prima facie unjustified but have failed to timely assert their right to speedy trial or to adequately demonstrate prejudice resulting from the delay. Accordingly, the *Wingo* balancing test belies the defendants' contention that they have been denied their constitutional right to a speedy trial.[8]

### 3. Other Assignments of Error

The defendants contend that the government breached a promise not to pros-

---

**8.** The defendants do not contend that they have been denied due process of law in violation of the fifth amendment as a result of the delay. Such a claim would require a showing of actual prejudice. *United States v. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977). Nor have the defendants addressed the applicability of the transitional plans for the prompt disposition of criminal cases adopted pursuant to Rule 50(b) of the Federal Rules of Criminal Procedure and the Speedy Trial Act of 1974. 18 U.S.C. § 3161, et seq. In any event, failure to

comply with the provisions of these plans does not per se establish a constitutional violation requiring dismissal with prejudice. E. g., Amended Plan For The Northern District of Texas For Achieving Prompt Disposition of Criminal Cases Under Rule 50(b), F.R.Cr.P., And The Speedy Trial Act of 1974, 1. Rather, the court retains the discretionary power to dismiss the indictment pursuant to Rule 48(b) of the Federal Rules of Criminal Procedure. *Id.* at 15.

ecute them for the instant offense if they would continue to testify, and, accordingly, has run afoul of our holding in *Geisser v. United States,* 513 F.2d 862 (5th Cir. 1975). In *Geisser* there was no serious dispute that certain promises had in fact been made to the defendant. The case at bar presents an entirely distinct factual milieu. The only evidence in the record to support the defendants' contention that they were promised non-prosecution is found in the testimony of the defendant Greene during the hearing on the motion to dismiss the indictment. Greene testified that he was told by Mr. Don Senate, a Justice Department official, that "As far as I know, it looks like there are no criminal charges against you people. There is going to be a civil suit against you and Sal and the department. That's all I know about." R. Vol. III, 22. Greene further stated that he was told by Mr. Don McCaffery, an Assistant United States Attorney, that "his understanding was that it was going to be a civil suit against us." *Id.* Assuming that these statements were in fact made, it is abundantly clear that by no reasonable interpretation can they be deemed to constitute a "promise" within the meaning of *Geisser.* They indicate mere speculation and a lack of personal knowledge as to the actual status of the case. Accordingly, the contention of the defendants is without merit.

 The defendants next contend that the evidence was insufficient to support the conviction. Specifically, they argue that the government failed to prove beyond a reasonable doubt (1) that Lakewood Bank and Trust Co. was federally insured at the time the loan application was filed, (2) that the bill of sale was false, and (3) that the falsity of the bill of sale was material. We feel that the evidence, when considered in the light most favorable to the government, is sufficient beyond a reasonable doubt to support the convictions. Bank officer Mead testified that, to the

best of his knowledge, the bank's deposits have at all times been insured by the Federal Deposit Insurance Corporation. This testimony was in no way rebutted or impeached. Second, Gary Triano, whose purported signature appeared on the bill, testified that he did not sign the bill of sale and that the equipment had not been purchased from Arizona Frontier Used Cars. As to the issue of materiality, Mead testified that the loan would not have been made if Mead had known that Greene had not committed his capital to the purchase of the equipment in September of 1974. Mead testified that the bill of sale would operate to verify Greene's assertion that operating capital was needed due to Greene's recent exhaustion of capital in acquiring the equipment. Although the defendants did cross-examine Mead concerning an alleged prior inconsistent statement, it was within the province of the trier of fact to resolve conflicting statements and to determine whether prior statements undermined the trial testimony. *See United States v. Cravero,* 530 F.2d 666, 670 (5th Cir. 1976). The testimony of Mead provided ample evidence on the issue of materiality. In any event, there is evidence in the record to support a jury finding that at least some of the equipment referred to in the bill of sale was subject to a lien held by the Great Western Bank and Trust Co. of Tucson, Arizona, which was not disclosed on the bill of sale. Such conduct would certainly constitute a materially false statement within the meaning of 18 U.S.C. § 1014.

 Finally, the defendants contend that the trial court committed error in admitting evidence of "other acts" in violation of Rule 404(b) of the Federal Rules of Evidence.[9] The "other acts" consist of other loan transactions between the defendant Greene and Lakewood Bank. The defendants contend that admission of this evidence invited the jury to convict the defendants on the basis of other *unpaid* debts. We

---

**9.** Rule 404(b) provides:

Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person to show that he acted in conformity therewith.

It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

cannot agree. The evidence of other loans was introduced solely to aid the jury in understanding the circumstances leading up to the loan in question. The government elicited no testimony as to whether the loans had been repaid until after the defendants established that some of the loans had been repaid and implied that collateral had been treated in a manner prejudicial to the rights of the defendants. Furthermore, the trial court carefully instructed the jury that civil debt is not a basis for criminal liability and that failure to repay prior debts can be considered only as to the issue of intent. R. Vol. III, 391.

The other assignments of error raised by the defendants are totally without merit, and, accordingly, the convictions of the defendants Greene and Cataldo are hereby affirmed.

AFFIRMED.