**STATE of Maine**

v.

**Leon LEATHERS.**

Supreme Judicial Court of Maine.

Oct. 24, 1979.

---

David W. Crook (orally), Dist. Atty., Skowhegan, for plaintiff.

Butler & Bilodeau by William Thomas Hyde (orally), Skowhegan, for defendant.

Before McKUSICK, C. J., and POMEROY, WERNICK, GODFREY, NICHOLS and GLASSMAN, JJ.

WERNICK, Justice.

Defendant appeals from a judgment of conviction entered March 7, 1979 in the Superior Court (Somerset County) on the verdict of a jury finding him guilty of having committed, on August 31, 1977, the crime of "arson" by causing his house to be set on fire "with the intent to enable . . collect[ion of] insurance proceeds for the loss caused by the fire", in violation of 17-A M.R.S.A. § 802(1)(B)(1).[1]

On the evidence the jury had ample warrant to find beyond a reasonable doubt the following facts. In September, 1976, defendant listed his house in Skowhegan, Maine, for sale. The house did not sell, and there. was still no prospect of a sale one year later when the house was destroyed by fire. During the summer of 1977 defendant talked with one of his friends, Albert Poulin, about having his house "taken care of." Poulin then arranged a telephone call from his house to a Maxwell Dragon in Peru, New York, where Dragon lived. Defendant participated in that telephone call by speaking with Dragon, who was then a total stranger to defendant. A few weeks later defendant left Skowhegan to take a vacation trip of several days to Ontario, Canada and Niagara Falls. Before departing, defendant removed many valuable items— over four thousand dollars worth of guns, afghans, clothing and bedding—from his house. The guns he left in his father's house. He took the afghans, clothing and bedding to a camper belonging to Poulin. While defendant was away on vacation,

Maxwell Dragon, at the end of August, came to Skowhegan. He was accompanied by his brother, Thomas. On August 30th, Poulin showed the Dragon brothers the general location of defendant's house and pointed out the house to them. The next day the Dragon brothers filled several milk containers with gasoline, and Poulin, who had access to the key to defendant's house, drove the Dragons to the vicinity of the house. Within half an hour defendant's house was on fire. Two or three weeks after the fire defendant removed the afghans and bedding from Poulin's camper and placed them in an automobile, displaying New York license plates, that Maxwell Dragon had driven to Poulin's house.

■ This recounting of the facts the jury had warrant to find beyond a reasonable doubt makes plain that the evidence was sufficient to support the jury's verdict finding defendant guilty of the crime charged against him. We therefore quickly pass, and reject, defendant's first point on appeal contesting the adequacy of the evidence to support the conviction.

We turn for more extended discussion to the one other point on appeal raised by defendant, that reversible error was committed at trial when, over defendant's objection claiming lack of relevance and improper prejudice to defendant, the presiding Justice permitted an insurance adjuster, called as a witness by the prosecution, to testify as to his opinion that defendant had inflated the values of a few particular items of property listed in the proof of loss filed with the insurance company.

The alleged error occurred when the prosecutor in his direct examination of the insurance adjuster began to question him about certain items of property listed in the proof of loss. When defense counsel objected, asserting that the proffered testimony

1. The pertinent language of the statute is:
 "*1.* A person is guilty of arson if he starts, causes, or maintains a fire or explosion;

 "*B.* On his own property or the property of another .

 *(1)* with the intent to enable any person to collect insurance proceeds for the loss caused by the fire or explosion; . . .."

lacked relevance and had potential to subject defendant to improper prejudice, the prosecutor argued to the presiding Justice (outside the hearing of the jury) that his purpose was to show that defendant had listed as lost in the fire various items which other evidence had shown, or would show, defendant had removed from his house before the fire. The prosecutor contended that defendant's making claim for a loss of property that had not in fact occurred was relevant to show a comprehensive plan by defendant to burn his house with intent to collect insurance proceeds to which he was not legally entitled.

We have no occasion to decide whether the prosecutor's theory of relevance was correct because subsequent developments rendered the prosecutor's theory inapplicable to this case. After the colloquy with the Court when the prosecutor resumed his questioning of the insurance adjuster, instead of asking him about those specific items that independent evidence had shown, or would show, defendant had removed from his house before the fire occurred, the prosecutor asked only about a few other items as to which the evidence indicated no doubt of their having been lost in the fire. In regard *only to these latter items*, despite defense counsel's continuing objection of lack of relevance and potential for unfair ·prejudice to defendant, the insurance adjuster was permitted to state his opinion that defendant had claimed inflated valuations.

Even if it were the fact, and not merely the insurance adjuster's opinion, that defendant exaggerated the values of a few items lost in the fire, that fact would lack relevance to the crime of arson charged against defendant. If, after the fire, defendant may have sought to take advantage of the insurance company by seeking to be paid more for some items lost in the fire than they were really worth, that has no rational tendency, in accordance with the definition of "relevant evidence" set forth in Rule 401 M.R.Evid., to make "more probable or ·less probable" any "fact . . . of consequence to the determination of . . . " the prosecution of defendant for arson.

Patently lacking is such a probative relation to those facts constituting the essential element of the crime of arson, as charged here, that defendant be responsible for the incendiary origin of a fire on a person's property.

Addressing more particularly the facts constituting the other essential element of the crime, defendant's intent *existing* at the time of the fire to "enable . . . collect[ion of] insurance proceeds for the loss caused by the fire", we analyze the "relevance" issue in two potentially applicable aspects.

■ We emphasize, first, that this requisite specific intent need not involve any kind of falsification by the owner of the property burned when he seeks payment of insurance proceeds for his loss by fire. For example, suppose a loving relative of the owner of an unsalable house knows that the owner is in desperate need of money, and entirely without the owner's knowledge or participation, sets fire to the house to enable the owner to collect fire insurance proceeds. The relative thereby commits the crime of arson, and the owner of the house, in complete innocence and without in any way being required to make any false statements to the insurance company, can claim and collect the insurance proceeds for his loss.

What of the more frequently occurring case where the owner of the burned house is the defendant charged with arson, and some evidence is presented relevant to show that defendant had caused his house to be set afire with the intent that he be enabled to collect the insurance proceeds for the fire loss? It may be true that in such situation defendant's specific intent will include, as necessary to enable his collection of insurance proceeds, the intent to make particular misrepresentations to the insurance company. Yet, these misrepresentations differ so markedly from the kind of dealing with the insurance company constituted by exaggerating the values of a few items of property lost in the fire that evidence of this latter

type of conduct, occurring after the fire, lacks rational tendency to make "more probable" that defendant participated in the incendiary burning of his property having the intent of being enabled to collect insurance proceeds for the fire loss. This remains true whether such evidence is offered to stand by itself or to supplement other relevant evidence.

The presiding Justice thus erred in permitting the insurance adjuster to state his opinion that defendant had claimed inflated values for particular items lost in the fire.

 We conclude, however, that this error was harmless.

The evidence plainly established, and defendant did not even purport to dispute, that the Dragon brothers, with the assistance of defendant's friend Poulin, deliberately set fire to defendant's house. Defendant claimed to be innocent of arson on the ground that he had no advance knowledge of, and in no way participated in, what Poulin and the Dragon brothers had done. Testifying in his own behalf, defendant told a story that constituted the only evidence in the case tending to exculpate him. Defendant categorically denied knowing, or having any contact whatever with, either of the Dragon brothers before the fire. He said that he first met Maxwell Dragon a couple of months after the fire, when in late October or early November he was on a hunting trip with Poulin and Poulin introduced him to Maxwell Dragon and Dragon's friend, Jim Mason. It was at that time, according to defendant, that he delivered afghans and bedding to Maxwell Dragon and Jim Mason, as the consummation of a sale of the property to Jim Mason. Seeking to make sense of the seeming illogic of acknowledging, on the one hand, that total strangers, assisted by his friend Poulin, had burned his house, while contending, on the other hand, that he had nothing to do with that project, defendant vaguely intimated that Poulin may have had a motive for so acting without defendant's knowledge and participation; defendant mentioned that he had filled in on a job for Poulin, and when it was time for Poulin to get back the job, the company decided to let defendant, rather than Poulin, have the job.

Other evidence, however, rendered defendant's purported exculpatory account of events so highly suspect that it verged on being incapable of belief by reasoning persons.

Louise Smith, who was friendly with Poulin as well as with defendant and his wife, gave testimony directly contradicting defendant's version of when, and in what circumstances, defendant met Maxwell Dragon. Louise Smith stated, as Poulin's testimony confirmed, that in the month of September, two or three weeks after the fire, she was introduced to Maxwell Dragon and his friend, Jim Mason, at Poulin's house when defendant and his wife were present. Shortly before this, she had seen defendant remove his afghans and bedding from Poulin's camper and place them in an automobile, bearing New York license plates, that she had seen Maxwell Dragon drive to Poulin's house. Nothing in the evidence, except what defendant said, indicated any reason for inaccuracy, or falsity, in Louise Smith's testimony.

As further bearing on whether defendant had been in contact with the Dragon brothers before, or very soon after, the fire at his house, defendant admitted on cross-examination that on his return trip from his vacation at Ontario and Niagara Falls he drove through Peru, New York, shown by other evidence to be where the Dragon brothers lived.

Lastly, defendant's intimation of a possible motive for Poulin to arrange with strangers to burn down defendant's house without defendant's knowledge, or participation, was entirely uncorroborated.

Thus, independently of the evidence erroneously admitted, the evidence of defendant's guilt was cogent. Added to this, the wrongly admitted evidence was itself merely the *opinion* of an insurance adjuster. Since the source of this opinion was one whose interest in the subject matter would tend to generate a biased point of view, it is highly questionable that the opinion he ex-

pressed would carry much weight with the fact-finder. Moreover, the adjuster acknowledged on cross-examination that, generally, differences of opinions as to values arise as part of the settlement of insurance claims and these differences are commonly resolved by negotiation and compromise. If, then, the opinion of the insurance adjuster may have cast some thin cloud upon defendant's credibility, as a potential prejudice to defendant, that cloud was dissipated when the adjuster added the explanation, in effect, that differences of opinion as to values and the resolution of the differences by bargaining them away are practically routine in the adjustment of insurance claims.

On the entirety of the evidence, the trial error complained of by defendant was harmless.

The entry is:

Appeal denied.

Judgment of conviction affirmed.

ARCHIBALD, J., did not sit.