**STATE of Maine**

v.

**Nelson SPEARIN.**

Supreme Judicial Court of Maine.

Argued Sept. 15, 1983.

Decided May 31, 1984.

David M. Cox, Dist. Atty., Gary F. Thorne, Asst. Dist. Atty. (orally), Bangor, for plaintiff.

Steven C. Fletcher (orally), Rockland, for defendant.

Before McKUSICK, C.J., NICHOLS, VIOLETTE, WATHEN and GLASSMAN, JJ., and DUFRESNE, A.R.J.

McKUSICK, Chief Justice.

After a jury trial in Superior Court (Penobscot County) defendant Nelson Spearin was convicted for arson, Class B, 17–A M.R.S.A. § 802 (1978),[1] conspiracy to commit arson, Class C, 17–A M.R.S.A. § 151 (1983), and solicitation of arson, Class C, 17–A M.R.S.A. § 153 (1983). On appeal to the Law Court,[2] defendant sets forth eight separate arguments, claiming error relating to the sufficiency of the evidence, the conduct of the proceedings, the sufficiency of the indictment for solicitation, and the constitutionality of his conviction for both arson and conspiracy to commit arson. We conclude that defendant's convictions did not result from any reversible error, and therefore we deny his appeal.

The evidence adduced at trial may be summarized as follows: On July 5, 1977, a fire took place in defendant's house at 67 Taylor Street in Lincoln. The State's first witness, Ronald McComb of the Lincoln Fire Department, arrived at the scene of the fire at approximately 11:00 p.m. After the fire had been brought under control, McComb entered the house to take photographs. There he observed burn damage in a downstairs room, in an upstairs room, and in the crawl space separating the two rooms. In the downstairs room McComb observed rags and papers piled on top of a bureau.

Fire Investigator John Stevens of the State Fire Marshall's Office visited the scene of the fire three days later. In the back room of the house he observed a cardboard box containing burnt rags and papers, sitting on a bureau. Like McComb, Stevens saw burn damage on the wall adjacent to the bureau, in the crawl space above it, and in the upstairs room. Stevens stated that the bureau was the low point of the burn and the likely point of origin. He also found down-burning on the flooring timbers in the crawl space, which he testified was consistent with the fire having burned for a long period of time or having been accelerated in the crawl space by means of a flammable liquid. Testifying as an expert in arson investigation, Stevens gave his opinion, arrived at through a process of eliminating possible alternatives, that the fire was of human origin.

Several other witnesses testified as to inculpatory statements purportedly made by defendant following the fire. Peter and Holly Quirion, acquaintances of defendant, both testified that in May of 1978 defendant admitted to them that he was responsible for the fire. Another witness, Linda

---

1. *Amended by* P.L.1979, ch. 322, § 2; P.L.1983, ch. 450, § 4. P.L.1979, ch. 322, § 2, effective September 14, 1979, made arson a Class A crime.

2. In addition to the appeal of his convictions now before the court, defendant filed an appeal of the trial court's denial of his motion for new trial. On September 15, 1983, we heard oral argument on both the appeal from the convictions and the appeal of the denial of the motion for new trial. In *State v. Spearin*, 467 A.2d 173 (Me.1983), we vacated the Superior Court's denial of the motion for new trial and remanded the motion for rehearing. At that time we elected to defer further decision until the Superior Court had ruled again upon the motion for new trial. *Id.* at 173 n. 1. That motion having been denied on remand, we now address the issues raised by defendant on his appeal from his convictions.

Crosby, testified that on several occasions after the fire she heard defendant tell her boyfriend, one James Hamilton, that he would pay Hamilton for setting the fire just as soon as he received the insurance money. Trooper Ronald Graves of the Maine State Police testified that defendant told him, "I burned—I mean ... my house burned and I'm waiting for money for that." Finally, Anne Neaher testified that a few days prior to the fire defendant and James Hamilton visited her home and offered her husband, Marshall Neaher, money if he would burn defendant's house.

Robert Neal, an insurance agent, testified that 13 days before the fire defendant had come to Neal's office to request that Neal transfer the ownership of the insurance policy on the house from his mother's name to his own. He also asked for an increase in the amount of coverage and for coverage for the contents of the house. After the fire defendant filed a claim under the insurance policy.

## A. *Sufficiency of the Evidence*

■ 1. *Corpus Delicti.* The State's burden of establishing corpus delicti is twofold. The State must produce 1) sufficient credible evidence exclusive of any admission or confession of the defendant as will "create a substantial belief that the crime has been committed by some person," and 2) sufficient evidence on the whole record to establish the corpus delicti beyond a reasonable doubt. *State v. Curlew*, 459 A.2d 160, 164–65 (Me.1983). Defendant contends that the State satisfied neither of these standards.

■ The degree of proof of the corpus delicti exclusive of the defendant's statements need not be beyond a reasonable doubt. *Id.* at 165; *State v. Snow*, 438 A.2d 485, 487 (Me.1981). The necessary quantum of proof is less than a "fair preponderance of the evidence" and resembles the probable cause standard. *State v. Curlew*,

459 A.2d at 165; *State v. Snow*, 438 A.2d at 487; *State v. Ames*, 388 A.2d 94, 96 (Me.1978); *State v. Atkinson*, 325 A.2d 44, 45 n. 1 (Me.1974). If properly admitted, Fire Inspector Stevens' opinion testimony that the fire was of human origin provided a sufficient basis for the trial court's determination that the State had met its initial corpus delicti burden.

■ Defendant challenges both Stevens' competence to give expert testimony and the basis for his opinion that the fire was of human origin. Stevens testified that at the time of the trial, some five years after the fire, he had been with the State Fire Marshall's Office for eight years. He stated that at the time of the fire he had served as chief investigator in "possibly a hundred or more" fires and had received three weeks of classroom training. Prior to joining the State Fire Marshall's Office, Stevens had served as a firefighter with the Orono Fire Department for six years, during which he had received at-the-scene training by fire investigators. While we agree with defendant that Stevens' record of formal instruction was limited we cannot say that the presiding justice committed an abuse of discretion in permitting Stevens to testify as an expert in arson investigation. *See State v. Anderson*, 434 A.2d 6, 9 (Me. 1981); *State v. Elwell*, 380 A.2d 1016, 1019 (Me.1977).

Defendant also challenges the basis of Stevens' conclusion that the fire was of human origin. After identifying the bureau top as the likely point of origin, Stevens reached the conclusion that the fire was caused by a human being through a deductive process of eliminating natural and accidental causes. Stevens testified that through his investigation he was able to rule out spontaneous combustion, storage of flammable liquids, lightning, and a woodstove or kitchen range as possible causes of the fire. A representative of Bangor Hydro-Electric Company, who testified just prior to Stevens, stated that there

was no electrical service to defendant's house at the time of the fire. By eliminating all natural and accidental causes in the area of origin, Inspector Stevens concluded that the fire was intentionally set.

We have in the past approved the admission of expert opinion as to the origin of fires based on the process of elimination. *See State v. Elwell*, 380 A.2d 1016; *see also State v. Spearin*, 463 A.2d 727, 729, 731 (Me.1983). However, defendant strenuously urges, on the basis of our opinion in *State v. Howes*, 432 A.2d 419, 424–26 (Me. 1981), that the process of elimination was a legally deficient method for determining the cause of the fire in this case. In *Howes*, the fire inspector, who was the same John Stevens, did not visit the scene of the fire until 14 months after it occurred, and by that time the area was completely burned out and overgrown. He acknowledged that he was unable to determine the fire's point of origin and that he had not investigated several incendiary materials present at the scene. We found that under those circumstances the process of elimination was a legally deficient basis for the conclusion that the fire was of human origin, and we held that the State had not carried its *overall* burden of proving the corpus delicti *beyond a reasonable doubt. Id.* at 425.

■ Here, by contrast, Stevens visited the fire three days after it occurred, was able to identify the likely point of origin, and was able to eliminate the natural and accidental causes in the area of origin. While there is room in the record to question Stevens' conclusions, such questions go to the weight of the evidence, not its sufficiency. *See State v. Spearin*, 463 A.2d at 731. We find that the inspector did

have a sufficient basis to support his belief that the fire was intentionally set.[3]

When defendant's inculpatory statements are included, there can be no doubt but that on the record as a whole the State met its burden of establishing the corpus delicti of arson beyond a reasonable doubt. *See State v. Curlew*, 459 A.2d at 164. Four different witnesses testified as to statements made by defendant admitting responsibility for the fire.

2. *Solicitation.* Defendant also claims that there was insufficient evidence presented at trial to sustain his conviction for solicitation. Under Maine law a person is guilty of solicitation

> if he commands or attempts to induce another person to commit murder or a particular Class A or Class B crime, whether as principal or accomplice, with the intent to cause the commission of the crime, and under circumstances which the actor believes make it probable that the crime will take place.

17–A M.R.S.A. § 153(1). Count III of the indictment, tracking the language of this provision, charged defendant with soliciting Marshall Neaher to commit the crime of arson. On appeal defendant claims that the State introduced no evidence from which the jury could rationally conclude beyond a reasonable doubt that defendant's offer to pay Marshall Neaher a sum of money to burn defendant's house was made under circumstances that defendant believed made "it probable that the crime would take place."

The principal evidence relating to the charge of solicitation was the testimony of Anne Neaher, Marshall Neaher's estranged wife. She testified that shortly before the

---

**3.** There is substantial evidence in the record apart from the testimony of Stevens upon which a finding that the State had met its initial corpus delicti burden could be based. That evidence includes the photographs taken and observations made by the firemen who were at the scene of the fire as well as the action of defend-

ant in increasing his insurance coverage prior to the fire. Because we find that Stevens' opinion was properly admitted and was, of itself, sufficient to sustain the corpus delicti burden, we need not address the probative effect of this other evidence.

fire, Marshall, who was then living in New Jersey, visited her home for a week or so. During that period defendant made two visits to the Neaher home. The first time, defendant and Neaher were introduced but spoke only briefly; defendant was informed that Neaher was visiting from New Jersey and would have to return there for his job. About four days later defendant returned with his friend, James Hamilton, for a second visit. This second time, defendant, Hamilton, and Marshall Neaher sat in the kitchen while Mrs. Neaher was in the adjoining living room attending her children. During the conversation, she heard defendant mention burning his house as a way of getting money that he needed. Marshall, who was in the home improvement business, suggested that instead defendant fix it up. The conversation turned to other topics, but later defendant returned to the subject of burning the house. Mrs. Neaher testified that defendant offered Marshall "a large amount of money, in the hundreds of dollars," if he would set fire to the house. Defendant told Marshall that "since he was going back to New Jersey, he wouldn't get caught." According to Mrs. Neaher, Marshall declined the offer. Two other witnesses, Peter and Holly Quirion, testified that sometime after the fire defendant told them that it was easy to get someone from out of state to burn a house.

When a conviction is challenged on the basis of the sufficiency of the evidence, we will set aside the conviction only if, after viewing the evidence in the light most favorable to the State, the factfinder could not rationally have found proof of

guilt beyond a reasonable doubt. *State v. Snow*, 464 A.2d 958, 961 (Me.1983); *State v. Spearin*, 463 A.2d at 731; *State v. Caouette*, 462 A.2d 1171, 1176 (Me.1983). Here the evidence showed that after being introduced to Marshall Neaher and learning that Marshall was visiting from out of state, defendant returned to the Neaher home with James Hamilton, who the evidence indicated later set the fire, and engaged Marshall in conversation. During that conversation defendant raised the subject of burning his house twice, and went on to offer Marshall a substantial sum of money—in the hundreds of dollars—if he would burn it. He further explained to Marshall that he would not be caught for the crime because he was returning to New Jersey. This record, including the evidence of defendant's subsequent actions and his remarks to the Quirions, plainly indicates that the offer was meant seriously and was made with the intent to cause commission of the crime. Given the evidence heard by the jurors we cannot conclude that they could not rationally find that defendant believed it probable that his offer to Neaher would result in the commission of the crime.

*B. Conduct of the Proceeding*

3. *Speedy Trial.* Defendant claims that he was denied his right to a speedy trial, guaranteed by the sixth and fourteenth amendments to the Constitution of the United States and article I, section 6 of the Constitution of the State of Maine, and also that he was tried in violation of 34 M.R.S.A. §§ 1391–1392 (1978).[1] Defendant was indicted on March 4, 1980, but was not brought to trial until September 20, 1982, some 30 months later. The record reveals

4. § 1391. Procedure

Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of this State, and whenever during the continuance of the term of imprisonment there is pending in this State any untried indictment, information or complaint against the prisoner, he shall be brought to trial within 180 days after he shall have caused to be delivered to the prosecuting official of the

county in which the indictment, information or complaint is pending, and the appropriate court, written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information or complaint. For good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance. . . .

that during the 12-month period between the date of the indictment and the date when defendant's present counsel was appointed, March 17, 1981, defendant changed counsel three times. Defendant's first of many motions for speedy trial was denied by the Superior Court on June 12, 1980,

> because defendant requested new counsel and being advised under circumstances that delay would necessarily occur, defendant nevertheless wished to have new counsel and new counsel was appointed.

Following the denial of this motion, defendant went on to change counsel two more times. After present counsel was appointed on March 17, 1981, defendant filed two motions to dismiss, which were heard by the Superior Court on October 5, 1981, and April 6, 1982, and denied. The record indicates that further delay was occasioned by a lawsuit commenced by defendant against the justice scheduled to preside at trial, resulting in that justice disqualifying himself from the case.

■ Defendant's final motion to dismiss, based on the alleged failure to provide de-

---

**§ 1392. Limitations**

In the event that the action is not brought to trial within the period of time provided, no court in this State shall any longer have jurisdiction thereof, nor shall the untried indictment, information or complaint be of any further force or effect, and the court shall enter an order dismissing the same with prejudice.

**5.** Applying the four factors enumerated in *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972), more particularly, we find the second factor—"the reason for the delay"—to be decisive of defendant's contention. We note that while the length of delay, 29 months, was substantial, delays of similar and greater duration have been sanctioned by the courts. *See id.* (5-year delay); *United States v. Greene*, 578 F.2d 648, 655 (5th Cir.1978) (30-month delay); *State v. Smith*, 400 A.2d 749, 752 (Me.1979) (25-month delay). Defendant's repeated changes of representation made it impossible for defendant to be tried for at least the first year of this delay, between March 4, 1980, and March 17, 1981. The Superior Court docket indicates that the case was placed on the jury list on May 5, 1982, but that the justice assigned

---

fendant with a speedy trial, was denied on the ground that delay in bringing defendant to trial was attributable to the actions of defendant and his counsel. We have said with respect to an inmate-defendant's right under 34 M.R.S.A. §§ 1391–1392 to stand trial within 180 days of filing an appropriate request that

> [a] defendant should not be able to claim that the State is dilatory in bringing him to trial while he is constructing obstacles that the State must overcome in order to get his case to trial.

*State v. Heald*, 393 A.2d 537, 543 (Me. 1978). Further, in applying the factors enumerated in *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972), to claims of violation of the constitutional right to speedy trial, we have consistently held that delay attributable to the defendant's actions should not be charged against the State.[5] *See State v. Mahaney*, 437 A.2d 613, 620 n. 7 (Me.1981); *State v. Lee*, 404 A.2d 983, 987 (Me.1979); *State v. Smith*, 400 A.2d 749, 753 (Me. 1979). Defendant was free to take whatever actions he felt were necessary to protect

---

to the case disqualified himself on that date because of defendant's actions. Delay after May 5, 1982, must also be attributed to defendant. *See State v. Smith*, 400 A.2d at 753. Of the remaining 14 months, 5 months were consumed in litigating defendant's repeated motions to dismiss. The docket reveals no attempts by the State during this period to delay the proceedings.

We note that defendant did diligently assert his right to speedy trial, the third factor under *Barker v. Wingo*. The fourth factor is prejudice suffered by the defendant as the result of delay. Because defendant was incarcerated for another offense during the pretrial delay, he was not entitled to sentencing credit under 17 M.R.S.A. § 1253(2) (1983). No actual prejudice was suffered on this account, however, because the sentence in this case was made consecutive to the term being served. Furthermore, both the prejudice actually suffered and the sincerity of defendant's attempts to obtain a speedy trial are undercut by his own dilatory tactics. *See State v. Mahaney*, 437 A.2d 613, 620 n. 7 (Me.1981); *State v. Lee*, 404 A.2d 983, 988 (Me.1979). We are unwilling to

> rule that ... defendant was denied ... [his] constitutional right [to speedy trial] on a

his rights prior to trial. He may not, however, use the delaying consequences of those actions as a basis for claiming that his trial was improperly delayed. We find no violation of defendant's constitutional right to speedy trial or his rights under 34 M.R.S.A. §§ 1391–1392.

4. *Defendant's insurance claim.* At trial the State was permitted over defense objection to examine defendant's insurance agent, Robert Neal, as to a request for increased coverage on the house that defendant made 13 days prior to the fire. Neal was permitted to testify that defendant asked him to transfer ownership of the insurance policy from defendant's mother to defendant, and to increase the amount of coverage from $8,000 to $25,000. Neal testified that he did not feel that the house was worth $25,000, but that he did agree to increase the coverage to $10,000. Neal also testified that he refused to give defendant coverage on the contents of the house.

Defendant contends, on the basis of our decision in *State v. Leathers,* 407 A.2d 15 (Me.1979), that evidence regarding changes that defendant sought in his insurance prior to the fire should have been excluded as irrelevant. In *Leathers* we held that evidence that defendant had exaggerated the value of property lost in a fire in making an insurance claim to be irrelevant, since it had no rational tendency,

> in accordance with the definition of "relevant evidence" set forth in Rule 401 M.R. Evid., to make "more probable or less probable" any "fact ... of consequence to the determination of ..." the prosecution of defendant for arson.

*Id.* at 17 (ellipsis in original).

▬ In contrast to *Leathers,* the testimony challenged in the instant case in-

volved actions the defendant took *prior* to the fire. Defendant's action was consistent with the formulation of a plan to burn the house so as "to collect insurance proceeds for the loss caused by the fire," *see* 17–A M.R.S.A. § 802, and was relevant in establishing that element of the crime. While Neal's testimony was certainly prejudicial to defendant's case, we discern no abuse of discretion in the Superior Court's decision that such prejudice was outweighed by the probative value of the evidence.[6] *See State v. Spearin,* 463 A.2d at 730–31.

5. *Motion for Mistrial.* In examining Peter Quirion, the prosecutor inquired as to why Mr. Quirion had asked defendant about the origin of the fire at defendant's house. After the presiding justice overruled defendant's objection to this question, the witness responded, "Because I thought he started the fire." Immediately following this answer, defense counsel renewed his objection on the basis that no foundation had been laid for the witness's opinion and moved for mistrial. The presiding justice denied the motion, but instructed the jury that it should disregard the statement as having any probative value as to who set the fire.

▬ A curative instruction will be deemed inadequate on appeal only where there are exceptionally prejudicial circumstances or prosecutorial bad faith. *State v. Hilton,* 431 A.2d 1296, 1302 (Me.1981). Here the prejudicial impact of Quirion's opinion as to who set the fire was overshadowed by his own testimony and the testimony of other witnesses that defendant had admitted responsibility for the fire. The record reveals no prosecutorial bad

record that strongly indicates, as does this one, that ... [he] did not want a speedy trial. *Id.* at 984 (quoting *Barker v. Wingo,* 407 U.S. at 536, 92 S.Ct. at 2195). See also our recent analysis in *State v. Cadman,* 476 A.2d 1148 (Me.1984).

**6.** We also find no reversible error in the Superior Court's decision to allow the State to examine

the lawyer representing defendant's insurance carrier as to certain statements defendant had made regarding his acquisition of the house and as to certain details of the insurance policy. Even if this testimony transcended the bounds of relevance, it was, at most, only minimally prejudicial to defendant.

## 1156

faith. We find no abuse of discretion in the trial justice's decision to give a curative instruction rather than grant the motion for mistrial. *See id.*

6. *Jury instructions.* The presiding justice gave the jury the following instruction with respect to the count of the indictment charging conspiracy:

So, if you believe beyond a reasonable doubt that Nelson Spearin engaged in conversations with one or more persons about starting a fire on his property, *and the evidence in this allegation, in this case, indicates he had such a discussion with one James Hamilton,* if you believe that he engaged in the conversation with Mr. Hamilton or another about starting a fire on his property, but you did not believe beyond a reasonable doubt that he or this other person took a substantial step towards the commission of the crime of arson, then you must return a verdict of not guilty.

If, on the other hand, you find that Mr. Spearin did in fact engage in conversation with another person, Mr. Hamilton, and you find that a substantial step was taken towards the crime of arson, you find all these elements beyond a reasonable doubt, then you may return a verdict of guilty on the charge of conspiracy.

(Emphasis added) On appeal defendant asserts that the italicized portion of this instruction violated 14 M.R.S.A. § 1105 (1980)[7] and article I, section 6 of the Maine Constitution (1965), as an expression of opinion by the presiding justice on an issue of fact. Because defendant failed to make a timely objection to this instruction before the jury retired, we must review this claim under the obvious error standard of M.R. Crim.P. 52(b). *See* M.R.Crim.P. 30(b),

52(b); *see also State v. Kessler,* 453 A.2d 1174, 1176 (Me.1983).

▪▪▪ In assessing defendant's claim that the presiding justice improperly expressed an opinion on an issue of fact, we will not review the challenged segment of the instruction in isolation:

To determine if a portion of a charge is erroneous, our duty is to examine the language objected to but to do so in light of the charge "as a whole."

*State v. Carter,* 379 A.2d 991, 993 (Me. 1977) (quoting *State v. Mimmovich,* 377 A.2d 116, 119 (Me.1977)). In the paragraph immediately following the challenged portion of the instruction, the presiding justice explicitly told the jury that to return a verdict of guilty it must "find that Mr. Spearin did in fact engage in conversation with another person, Mr. Hamilton." Read in light of this succeeding paragraph and in light of the prefatory comment that *"the evidence in this allegation ...* indicates [defendant] had such a discussion with one James Hamilton," the remark appears as nothing more than the justice's pointing out to the jury the evidence the State had presented to prove a conspiratorial agreement. Defense counsel's failure to object at the time the justice charged the jury tends to refute a belated claim of prejudice from any misstatement that can be constructed from an extended study of the transcript. *See State v. True,* 438 A.2d 460, 468 (Me.1981) ("trial counsel's failure to object ... will itself be a consideration in determining whether the error is obvious and highly prejudicial"). Any error that resulted from the trial justice's choice of language did not rise to the level of obvious error depriving defendant of a fair trial. *See State v. Kessler,* 453 A.2d at 1176.

7. **§ 1105. Charge to jury**
 During a jury trial the presiding justice shall rule and charge the jury, orally or in writing, upon all matters of law arising in the case but shall not, during the trial, including the charge, express an opinion upon issues of fact arising in the case, and such an expression of opinion is sufficient cause for a new trial if either party aggrieved thereby and interested desires it, and the same shall be ordered accordingly by the law court on appeal in a civil or criminal case.

## C. *Other Claims of Error*

 7. *Sufficiency of the indictment for solicitation.* Defendant was convicted for solicitation under an indictment closely tracking the language of 17–A M.R.S.A. § 153.[8] The count charged:

That on or about the 5th day of July, 1977, in the County of Penobscot, State of Maine, NELSON SPEARIN did command or attempt to induce Marshall Neaher to commit Arson, a Class B Crime, whether as principal or accomplice, with the intent to cause the commission of the crime of Arson, and under circumstances which the actor believe made it probable that the crime of Arson would take place.

An indictment must set forth all the "essential facts constituting the offense charged," M.R.Crim.P. 7(c), so as to enable the defendant to prepare his defense and, if acquitted or convicted, to protect him from double jeopardy. *State v. Coleman,* 452 A.2d 397, 399 (Me.1982); *State v. Pierce,* 438 A.2d 247, 250 (Me.1981). Where a statutory offense is charged it is normally sufficient for the indictment to describe the offense in the words of the statute or in language of substantial equivalence. *State v. Michaud,* 473 A.2d 399, 403 (Me.1984); *State v. Snow,* 464 A.2d 958, 961 (Me.1983); *State v. Gordon,* 437 A.2d 855, 857 (Me. 1981). Defendant nevertheless argues, in reliance on our decision in *State v. Creamer,* 379 A.2d 996 (Me.1977), that the indictment was insufficient for its failure to allege the specific circumstances which made him believe "it probable that the crime of Arson would take place." In so arguing, defendant misconstrues the import of the *Creamer* decision.

 In *Creamer* the defendant was charged with the crime of disorderly conduct under an indictment closely tracking the language of 17–A M.R.S.A. § 501(2) (1983), which provides:

A person is guilty of disorderly conduct if: ... In a public or private place, he knowingly accosts, insults, taunts, or challenges any person with offensive, derisive or annoying words, or by gestures or other physical conduct, which would in fact have a direct tendency to cause a violent response by an ordinary person in the situation of the person so accosted, insulted, taunted or challenged ....

This statute belongs to a special class of legislation that purports to punish speech and other communicative conduct *on the basis of its communicative impact.* Such statutes are constitutional only when their scope is limited to "fighting words" and other speech not protected by the first amendment. *See State v. John W.,* 418 A.2d 1097, 1101–02 (Me.1980). *See generally Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). Mindful of the first amendment concerns presented by the disorderly conduct statute, we held in *Creamer* that mere recitation of the statutory language in the indictment was insufficient: "There must be enough relevant information in the complaint so that the criminal character, if any, of the acts can be determined." *Id.,* 379 A.2d at 997.

 By contrast, the requirement in the solicitation statute that the command or inducement of another be made "under circumstances which the actor believes make it probable that the crime will take place" relates only to the defendant's belief, i.e., his *mens rea* at the time the *actus reus* was performed. It bears no relation to the communicative impact of the command or inducement on another. The constitutional issues that concerned us in *Creamer* are

---

**8.** 17–A M.R.S.A. § 153 provides in part:

A person is guilty of solicitation if he commands or attempts to induce another person to commit murder or a particular Class A or Class B crime, whether as principal or accomplice, with the intent to cause the commission of the crime, and under circumstances which the actor believes make it probable that the crime will take place.

**1158**

simply not present. Recitation in the indictment of the statutory language regarding defendant's belief at the time he attempted to induce Marshall Neaher to commit arson pinpointed a factual issue as to which defendant was warned he had to defend and as to which he obtained protection against double jeopardy. Recitation of the evidence was not necessary. *See State v. Michaud,* 473 A.2d at 403. The indictment adequately informed defendant of the nature and elements of the offense charged.

8. *Double jeopardy.* The evidence adduced at trial indicated that after the fire James Hamilton asked defendant on several occasions to pay money owed him for setting the fire. In its closing argument to the jury and in its brief, the State conceded that its only theory for holding defendant liable for the crime of arson was as an accomplice, with Hamilton acting as the principal. On appeal defendant contends that he cannot be convicted constitutionally of both arson as an accomplice and conspiracy to commit arson. He argues that because an agreement between Hamilton and him satisfied an element of both accomplice liability, 17–A M.R.S.A. § 57 (1983),[9] and conspiracy, 17–A M.R.S.A. § 151,[10] convic-

tion for both crimes violates the constitutional protection against double jeopardy.

It is well established that the fact that the same transaction constitutes two distinct statutory offenses does not, of itself, indicate a violation of the double jeopardy clause. *See Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932). The proper test, as articulated in *State v. Williams,* 395 A.2d 1158, 1167–68 (Me.1978), is whether the two statutory offenses are either identical or such that one is necessarily included in the other. It is clear that the offense of conspiracy is not identical to the offense of accomplice liability. Whereas only a "substantial step toward commission of the crime" is required for conspiracy liability, liability as an accomplice requires that the substantive offense be committed. *See* 17–A M.R.S.A. §§ 57, 151.

Nor can conspiracy be termed a lesser included offense of liability as an accomplice.

To be necessarily included in the greater offense, the lesser offense must be such that it is impossible to commit the greater without having committed the lesser.

*State v. Leeman,* 291 A.2d 709, 711 (Me. 1972). *See also State v. Goodall,* 407 A.2d

9. 17–A M.R.S.A. § 57 provides in part:
 1. A person may be guilty of a crime if it is committed by the conduct of another person for which he is legally accountable as provided in this section.
 2. A person is legally accountable for the conduct of another person when:

 B. He is made accountable for the conduct of such other person by the law defining the crime; or
 C. He is an *accomplice* of such other person in the commission of the crime, as provided in subsection 3.
 3. A person is an accomplice of another person in the commission of a crime if:
 A. With the intent of promoting or facilitating the commission of the crime, he solicits such other person to commit the crime, or aids or agrees to aid or attempts to aid such other person in planning or committing the crime. A person is an accomplice under this subsection to any crime the commission of

which was a reasonably foreseeable consequence of his conduct;

 · · · · ·

10. 17–A M.R.S.A. § 151 provides in part:
 1. A person is guilty of conspiracy if, with the intent that conduct be performed which, in fact, would constitute a crime or crimes, he agrees with one or more others to engage in or cause the performance of such conduct.
 . . . .
 4. No person may be convicted of conspiracy to commit a crime unless it is alleged and proved that he, or one with whom he conspired, took a substantial step toward commission of the crime. A substantial step is any conduct which, under the circumstances in which it occurs, is strongly corroborative of the firmness of the actor's intent to complete commission of the crime; provided that speech alone may not constitute a substantial step.

268, 279 (Me.1979). A person may become an accomplice of another in the commission of a crime if

> [w]ith the intent of promoting or facilitating the commission of the crime, he solicits such other person to commit the crime, or aids or agrees to aid or attempts to aid such other person in planning or committing the crime.

17-A M.R.S.A. § 57(3). A person may become a conspirator if

> with the intent that conduct be performed which, in fact, would constitute a crime or crimes, he agrees with one or more others to engage in or cause the performance of such conduct.

17-A M.R.S.A. § 151(1). While it is clearly possible that an agreement, such as the agreement between defendant and Hamilton, could provide the basis for liability under both provisions, it is also possible that a defendant could aid or attempt to aid another in the commission of a crime under the accomplice statute without entering into an agreement sufficient to satisfy the conspiracy statute. *See State v. Williams,* 395 A.2d at 1168.

> Aiding, abetting, and counseling are not terms which presuppose the existence of an agreement. Those terms have a broader application, making the defendant a principal when he consciously shares in a criminal act, regardless of the existence of a conspiracy.

*State v. Williams,* 395 A.2d at 1168 (quoting *Pereira v. United States,* 347 U.S. 1, 11, 74 S.Ct. 358, 364, 98 L.Ed. 435 (1954)). Thus, it is possible to commit the "greater" offense of accomplice liability "without having committed the lesser" offense of conspiracy. *State v. Leeman,* 291 A.2d at 711. *See State v. Williams,* 395 A.2d at 1167-68. Conviction for both arson as an accomplice and conspiracy to commit arson did not violate defendant's constitutional right to protection against double jeopardy.

We can find no merit in any of defendant's claims of error.

The entry is:

Judgments of conviction affirmed.

All concurring.